[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 426 
The question whether mutual insurance companies were taxable under the Revised Statutes upon the accumulations of their earnings as capital was one upon which different opinions might well be entertained while it was sub judice; but it has been settled by two cases which were fully argued and deliberately determined in this court. (Mutual Ins. Co. of Buffalo v.Supervisors of Erie, 4 Comst., 442; The Sun Mutual Ins. Co. v. The Mayor, c., of New-York, 4 Seld., 241.) To consider matters thus adjudged as open to reiterated discussion would lead to great public *Page 427 
inconvenience, and should not be permitted except in extreme cases, and where an error in the former decision is quite apparent. We do not consider the cases referred to as liable to that imputation. There is an additional reason why, in this instance, we should adhere to what has been decided. The legislature, as will presently be seen, has repeatedly acted upon the subject of these adjudications, assuming, as it seems to me, the law to be as laid down here, and making such changes as, in its wisdom, it considered expedient. We shall therefore adhere to the principle of the cases referred to; and they are decisive of one of the principal positions taken by the counsel for the insurance companies in the present cases, unless there is a distinction between the charters which were before the court on those occasions and that of the Mutual Life Insurance Company of New-York, which is now under consideration.
The Revised Statutes subjected to taxation upon their capital all moneyed or stock corporations. (1 R.S., ch. 13, p. 414, § 1, tit. 4.) The doubt was, whether the mutual insurance companies, chartered prior to the general act of 1849, were embraced within this provision. Strictly speaking they had no capital stock, for they were allowed to go into operation without any fund contributed by the persons setting them up. There were no stockholders and no shares. Each person who effected an insurance was a member while he continued to be insured, and the premiums paid by the members, so far as they were not needed to pay losses and expenses, were invested and were finally to be divided among the members in proportion to the premiums paid by them. Accounts were to be made up periodically, and certificates were to be given to the members for the portion of the accumulated profits to which they were respectively entitled at the time of stating the account. These amounts were not to be paid over immediately; they were to be retained by the corporation, subject to be diminished if the future losses should exceed the future premiums; but *Page 428 
eventually, they, with their accumulations, were to belong to the holders of the certificates, or their representatives or assigns, so far as they were not absorbed by the future exigencies of the business. The court held that these reserved funds were in the nature of capital, and were to be considered capital in the sense of the provisions of the Revised Statutes for taxing corporations. In the particulars which have thus far been mentioned, the arrangements of the charter under consideration are the same with those which were subject to examination in the two cases cited. The absence of a nominal capital stock, constituted in the first instance by the members, and divided into shares, and not to be paid back to those who furnished it, but to be held by the corporation until the end of the charter, was common to all these mutual companies; and it was the want of such nominal capital which raised the doubt whether they belonged to the class of companies which the legislature had in view in the provisions for taxing corporations upon their capital. The diversity relied upon by the counsel of the Mutual Life Insurance Company is that, by the charter of their company, when a member dies, the amount of reserved and accumulated profits standing to his credit is to be immediately paid to his legal representatives; whereas, in the two charters which have been before the court, no payment is to be made to the holders of certificates of profits until a certain large sum, $100,000 in the Buffalo Company, and $500,000 in the Sun Mutual Company, should be accumulated; and even then the distribution is not imperative. This difference is, no doubt, a pretty marked one, and it resulted from the different objects which the charters had in view, one being for insurance upon lives, and the other for indemnity against losses by fire or marine risks. But in respect to the conformity or want of conformity to the class of joint stock companies which were primarily contemplated by the provisions of the Revised Statutes for taxing corporations upon their capital, I do not perceive any material ground of *Page 429 
distinction. In all these mutual corporations, the amount which is considered as in substance the capital, for the purpose of taxation, would vary from time to time by the happening of the casualties insured against. The reserved fund, too, in all the mutual companies, belongs to the individual members in a sense somewhat different from the title which a shareholder of a proper joint stock corporation has in his portion of the capital stock. But in this respect they agree with each other. I am of opinion, therefore, that the distinction contended for, to take the present case out of the principle of the decided cases, cannot be sustained. This point being settled, an examination of the subsequent legislation will be all that is necessary to enable us to determine these cases.
In 1849, the act allowing corporations for purposes of insurance to be formed without a resort to the legislature was passed. Companies for insuring upon life or health were authorized to be organized with a capital of $100,000 actually invested, but not with a less capital. (Laws of 1849, 443, § 6.)
On the 29th June, 1853, a statute of a single section was enacted, which declared that any life insurance company incorporated prior to the passage of the above mentioned general act should be subject to taxation in the same manner "as if it were incorporated under said general law, with a capital of one hundred thousand dollars, as required by the sixth section of said general law." (Laws of 1853, 930.) By force of this statute, this company was brought into the category of ordinary incorporated moneyed or joint stock corporations, as regards the subject of taxation. All the provisions of the Revised Statutes respecting taxation immediately applied to it, as though it had a formal capital of the amount mentioned. It could not be assessed for any surplus, nor could it claim an exemption if its assets had been reduced by losses below the amount specified as its capital. (Bank of Utica v. The City of Utica, 4 Paige,
399.) It could *Page 430 
only be relieved from taxation on showing by affidavit, in the manner pointed out by the ninth section, that it had not during the preceding year been in the receipt of any income or profits. (1 R.S., 416, § 9.) But it was not only brought within the influence of the general law respecting taxation, as then existing, but any changes in that law would immediately apply themselves, to it. The case is the same as though the legislature had said that, for all the purposes of the laws of the state respecting taxation, these companies shall be considered as stock insurance corporations, having a capital of $100,000. Unfortunately, as I think, for this company, the Revised Statutes were, within a very few days, amended in a manner which operated very much to its prejudice. By an act passed 21st July, 1853, and which took effect immediately, the title of the Revised Statutes relating to the taxation of incorporated companies was changed so as to require that the amount to be entered in the fourth column of the assessment roll, which, by the existing law, was to be the amount of the capital stock paid in and secured to be paid in, should embrace also "the amount of all surplus profits or reserved funds exceeding ten per cent" of the capital. (Laws of
1853, 1240, § 1.) Other provisions of the amended act afforded some compensation for the increased burthen, by providing that such corporations as might fail to realize profits amounting to five per cent on the capital might commute by paying five per cent on those profits. But these provisions do not affect the present case. I have given due consideration to the argument which has been addressed to us to show that the act of June twenty-ninth should be taken as a law passed upon a consideration of the meritorious nature of this class of corporations, and intended to relieve them to a certain extent from participating in the public burdens, by fixing a comparatively small amount as an arbitrary limit of assessments to be made against them. Looking outside of the language employed, I think it highly probable that this hypothesis is *Page 431 
well founded; but the terms of the enactment do not allow us to hold that the case is permanently taken out of the purview of the laws of the state respecting taxation. A company incorporated under the general law with a capital of $100,000 would, after the amendment of July twenty-first, be assessed for its "surplus profits and reserved funds" exceeding ten per cent of the capital; and as these mutual companies are to be subject to taxation in the same manner, I do not see how they can be relieved from an assessment for surplus profits and reserved funds, unless the statute which I am next to consider requires us to give a different construction to this act of June twenty-ninth than that which we have supposed to be the legal one.
On the 24th March, 1855, a law was enacted declaring that the mutual companies incorporated prior to the general act should be subject to taxation on the sum of one hundred thousand dollars, "and no more." It was added, "and it is hereby declared that such was the intention, and it is the true construction of said act, of June 29th, 1853, in regard to any taxes imposed on said companies after said act took effect." (Laws of 1855, ch. 83.) All the judgments of the Supreme Court now under review were rendered at the special term before the enactment of this statute. The cases have since that time been pending on appeal before the general term and in this court, and were so pending when that statute was enacted. As regards these cases, the mandate of the legislature, if it has any application, must be regarded as addressed to the appellate tribunals. We habitually look with great respect upon all acts of the legislature, and never refuse to give them effect except where, upon the fullest consideration, we find that they conflict with the constitution. The act in question, considered as a persuasive argument for a particular construction of the statute of 1853, loses much of its weight from the consideration that the legislative bodies had been renewed in the interval between the two enactments, and that but a few of the *Page 432 
members of the legislature of 1853 sat in that of 1855; but if this were otherwise, we should feel constrained to rely upon the language of the statute which we are called upon to interpret, rather than any personal assurance as to the intention of its members. The acts of the legislature do not rest in any respect upon oral tradition. They are committed to writing, and it is by the written language that their sense is to be ascertained. As an authoritative mandate in favor of the construction claimed by the insurance company we cannot accord to it any force whatever. In the division of power among the great departments of the government, the duty of expounding written laws has been committed to the judiciary The legislature has no judicial power, and cannot upon any pretence interpose its authority respecting questions of interpretation pending in the courts. (Dash v.Van Kleeck 7 John., 477; Ogden v. Blackledge, 2 Cranch,
272.) We do not suppose that the legislature had any such design in passing this act. They had ample power to introduce a new rule upon this subject, and that rule I conceive might be made in a limited sense retrospective. As no vested private rights of individuals were disturbed, and the authority of the legislature over the subject of taxation was plenary, the new rule might, if considered expedient, be made applicable to questions of assessment depending before the administrative boards. This was probably all that was intended in this instance. We do not assume that it was designed to dictate to the courts, for this was not within the competency of the legislature; and beside, the act would have full effect if restricted in the manner I have suggested.
The case of The Mutual Life Insurance Company v. Jenkins
arose and was determined at the special term before the passage of either of the acts of 1853. The company was assessed at over $900,000, and the action was brought against a constable for levying the tax pursuant to a warrant issued according to law by the receiver of taxes. On the trial, the justification was set up, and the court, holding it sufficient, *Page 433 
dismissed the complaint. This judgment is sustained by the position that the company was taxable upon its reserved earnings as capital, according to the cases heretofore determined in this court.
The two other cases arose after the legislation of 1853, and before the act of 1855. The assessment was made by adding to the capital of $100,000 a portion of the "surplus profits and reserved funds" which it was shown the company had in its hands. The assessments were sustained by the Supreme Court; and the judgments were correct if the amendment of the Revised Statutes, passed on the 21st July, 1853, applied, as I have supposed, to this company. In the second of these cases the assessors set down the sum of $100,000 in the fourth column of the roll, being of opinion, apparently, that the act of June twenty-ninth was not affected by the subsequent amendment of the Revised Statutes, The tax commissioners changed this sum to $1,000,000, on the ground that the surplus profits were taxable under the amendment. A question is now made, whether, assuming that the assessors were wrong in the matter of law, the tax commissioners had power to correct the mistake. The act creating the board of tax commissioners requires it "to correct the assessment roll of each ward and add thereto and assess according to law any real or personal estate liable to taxation which may have been omitted by the said assessors." (Laws of 1850, 192, § 21.) It is argued that the tax commissioners have no right to change the valuation of property made by the assessors, but only to add items of property which have been omitted. This I think is so. The addition which is made in this case, however, is not for an increased valuation. The return of the board of supervisors, the allegations in which are admitted by the demurrer, states that the assessors mistakenly omitted certain bonds and mortgages which constituted the surplus profits, on the supposition that they were limited to the $100,000 by the act of June twenty-ninth. If this be *Page 434 
so, the error which was corrected was an omission to include certain personal property in the roll, and not an under valuation.
These views lead to an affirmance of the judgment of the Supreme Court in the three cases.