CITY OF CAMBRIDGE *vs.* BOARD OF RAILROAD COMMISSIONERS.

SAME *vs.* SAME.

Suffolk.    November 24, 1890. — January 12, 1891.

Present: FIELD, C. J., W. ALLEN, HOLMES, & MORTON, JJ.

*Railroad Commissioners — Highway — Grade Crossing — Certiorari — Mandamus.*

The St. of 1882, c. 155, and the St. of 1887, c. 282, providing for the construction of a bridge and avenue across the Charles River between the cities of Boston and Cambridge, authorized the city of Cambridge to lay out the avenue on its own side of the river at grade over the Boston and Albany Railroad without the concurrence and assent of the city of Boston; and the board of railroad commissioners had no authority to order the city of Cambridge to construct an overhead crossing over the railroad.

Certiorari, and not mandamus, is the proper remedy, if a board of public officers, when required by statute to perform a certain duty, do not refuse to act, but proceed to perform it in a manner founded upon an erroneous construction of the statute.

MORTON, J.  These are petitions for certiorari and for manda-
mus against the board of railroad commissioners, and are both
based on the same facts.  Two petitions were brought, owing to
the uncertainty as to which was the proper remedy.  The cases
were heard together, before a single justice, who found and ruled
in favor of the petitioner, and reported the cases to this court for
its decision as to whether certiorari or mandamus, or both or
neither, should issue.  The admissibility of certain evidence is
also involved.  At the hearing before the single justice, the city
of Boston and the Boston and Albany Railroad Company were re-
spectively allowed to intervene, and they filed answers and were
heard.  They also took part in the argument to the full court.
The board of railroad commissioners filed a brief, but did not
argue orally.

By the St. of 1882, c. 155, the cities of Boston and Cambridge
were given authority to build a bridge over Charles. River,
within certain lines, between those two cities, and to con-
struct an avenue from a point on Beacon Street in Boston to a
point in Cambridge west of the westerly line of the Boston and
Albany Railroad.  The plans of the bridge, and the manner of
its construction, were to be subject to the approval of the har-
bor and land commissioners.  Nothing seems to have been done
under this act by either city for several years, except that the
city engineer of Boston prepared plans in December, 1884, which
contemplated the extension of West Chester Park in Boston,
and of Front Street in Cambridge, with the erection of a bridge
between, as the bridge and avenue which the two cities were
authorized by the act to build and construct.  This plan was
approved by the city councils of the two cities.  In 1887 a man-
datory act (St. 1887, c. 282) was passed, which constituted the
mayors of Boston and Cambridge, with one other person to be
appointed by them, a board of commissioners, and in § 1 required
them "to construct a bridge and avenue across Charles River, be-
tween West Chester Park, in Boston, and Front Street extended,
in Cambridge, substantially in accordance with plans prepared by
the city engineer of the city of Boston, dated December, eighteen
hundred and eighty-four, and approved by the city councils of
said cities."  This act was made subject to the provisions of the
St. of 1882, c. 155, except so far as they were modified by it.

Afterwards, in July, 1888, the city of Cambridge widened, extended, and laid out Front Street from its then terminus to the southeasterly line of land of the Boston and Albany Railroad, crossing said railroad at grade. In the following year, viz. July 23, 1889, the city of Cambridge further laid out and extended Front Street from the terminus under the laying out of 1888, to the harbor commissioners' line in Charles River. In each of these layings out a grade was fixed. In the mean time, on May 21, 1889, the street commissioners of Boston laid out and extended West Chester Park " to the harbor commissioners' line on the south side of Charles River, at the Harvard Bridge, so called," and established its grade. By October, 1889, Front Street had been filled by the city of Cambridge to grade to the bridge, and by January, 1890, the bridge had been substantially completed with the West Chester Park extension to it on the Boston side. On January 21, 1890, Cambridge notified Boston that Front Street was the avenue to the bridge required by the St. of 1882, c. 155, § 1, and in the March following Boston accepted this as the avenue called for by that act, reserving the question of the railroad crossing for the consideration of the board of railroad commissioners. This was the first intimation from the city of Boston that it claimed a voice in fixing the grade of the avenue in Cambridge, or in the matter of the crossing of the Boston and Albany Railroad. It is evident from this recital that the bridge and the West Chester Park extension to it in Boston, and the laying out and extension of Front Street to it in Cambridge, were designed and constructed by the two cities and the commissioners as the bridge and avenue called for by the acts of 1882 and 1887.

In May, 1890, the city of Cambridge petitioned the railroad commissioners to prescribe, under the St. of 1882, c. 155, § 6, the details of the crossing at the Boston and Albany Railroad. At the hearing upon this petition the city of Boston objected that the crossing was not legally located, and the grade at the point of crossing had not been legally established, and that the city of Boston had not concurred in said crossing at grade. The Boston and Albany Railroad Company also made similar objections. The railroad commissioners decided, as appears from their printed opinion, which forms one of the exhibits in the case,

that the city of Cambridge had no authority to lay out Front Street at grade over the railroad, and that the manner of cross= ing was one of the details over which they had jurisdiction, and made the following order: " The avenue is to be carried over the railroad, the bridge to be constructed of iron, and to be at a height of not less than sixteen feet above the track of the railroad." Thereupon, these petitions were brought by the city of Cambridge, and substantially the same grounds have been taken by the city of Boston and the Boston and Albany Railroad Company at the argument before the full court as were taken by them before the board of railroad commissioners, and the brief of the board is in support of conclusions which they reached upon the hearing before them.

The first question is, whether the acts of 1882 and 1887 required concurrent action on the part of Boston and Cambridge in laying out so much of the avenue as was on each side of Charles River, and within their respective limits; and we think it is clear that nothing in either act did require it. The St. of 1882, c. 155, § 1, after authorizing the two cities to construct a bridge and avenue across Charles River and between certain termini in Boston and Cambridge, provides that " the location of said bridge and avenue shall be determined by the city councils of said cities acting separately." Then follow certain provisions regarding the bridge. It is to be built, so far as it affects the harbor, subject to the approval of the harbor and land commissioners. It is to be constructed of such materials as the two cities may agree upon ; but the piers are to be of iron or stone, of such size, shape, construction, and distance from one another as the board of harbor and land commissioners, after a hearing, shall determine and certify to each city. Section 2 provides that neither city " separately shall enter upon the construction of said bridge, but they shall jointly proceed to construct the same in accordance with plans to be submitted to and approved by the councils of said cities concurrently, and by the said board of harbor and land commissioners." The expense of constructing so much of said bridge as lies between the harbor commissioners' lines is to be borne in such proportions as the two cities may agree. The cost of keeping the bridge in repair, of maintaining the draw and draw-tender, and all damages recovered by reason of a defect or

want of repair in the bridge between the harbor lines or in the draw, are to be paid equally by the two cities.  Concurrent and agreeing action is thus expressly provided for on the part of the two cities in relation to matters affecting the bridge.  No such action is provided for, however, regarding the location and construction of so much of the avenue as lies within the respective limits of the two cities and is not included in the bridge.  In addition to the provision previously alluded to, that the city councils of the two cities are to act separately upon the matter of location, the statute provides that the cities shall act separately concerning other matters relating to those portions of the avenue on each side of the river, and within their respective jurisdictions.  Section 3 provides that each city may, within its own limits, purchase and take lands for said bridge and avenue ; that all the proceedings relating to such taking shall be the same as in the case of land taken for highways within said cities respectively, with like remedies to all parties interested ; and that betterments may be assessed in each city under the betterment acts in force in each city respectively.  Section 4 provides that each of said cities shall bear the expense, including land damages, of constructing such part of said bridge and avenue as lies upon its own side of the Charles River.  Each city is also left to bear the expense of maintaining and repairing that portion of the avenue that is within its own limits.  There is in all this no intimation that either city shall have anything to do with the other in laying out or locating or constructing that portion of the avenue that lies within the other's limits.

The St. of 1887, which relates solely to the bridge, also provides for concurrent action on the part of the two cities concerning the bridge, but says nothing about the rest of the avenue.

In view, therefore, of the different modes which are thus indicated for dealing on the one hand with the bridge, and on the other with those portions of the avenue which are in addition to the bridge, it cannot be said that the word " separately," in §§ 1 and 2 of the St. of 1882, refers to the manner in which the city councils of the two cities are to meet, and not to the subject matter of their action.  " Jointly and concurrently " are used as opposed to " separately," and the three words clearly refer to the matter which is to be the subject of the action of the re-

spective city councils, and not to the manner of the action of these bodies, and indicate that neither is to have any voice in the proceedings of the other upon its own side of the river.

It is insisted, however, that, the Legislature having provided for the building by the two cities of a bridge and avenue which were to constitute an important highway between them, the natural inference is that it intended, not only that they should act jointly and concurrently in regard to the bridge, but also in regard to the approaches and avenues leading to the bridge. But the location of the bridge would of itself determine to a considerable extent the course and direction of the avenues to and the approaches connected with it, and the Legislature may well have deemed it wiser to leave to each city the location, construction, and maintenance of that portion of the avenue which was on its own side of the river, thinking that each would be governed in this, as in the laying out of other streets and highways, by what would best promote the common convenience, than to adopt the unusual, if not unprecedented, course of giving to each city a voice in, and what would in substance be a veto upon, the location and construction of the avenue within the limits of the other city.

It is objected, in the next place, that the city of Cambridge had no authority to lay out the crossing at grade, and that the railroad commissioners had the power to prescribe the manner of crossing as one of the details. If the city of Cambridge had authority to lay out the crossing at grade, then it follows that the railroad commissioners had no power to order an overhead crossing. The sole reference to the matter of crossing in the St. of 1882, c. 155, is in § 6, which provides that "said avenue may cross at grade any railroad operated by steam, and the board of railroad commissioners shall, upon the application of either city or any railroad corporation, prescribe the details of the crossing." The only railroad which crosses the line of the avenue is that of the Boston and Albany Railroad Company in Cambridge; and it may be safely inferred that the Legislature had that fact before it when the statute of 1882 was passed. By that statute the Legislature provided for the construction of the bridge and avenue by the two cities, and directed that the location of the same should be determined separately by the two

city councils.   It also provided that in regard to the taking of land, payment of damages, assessment of betterments, and the rights of parties interested, each city should proceed according to the provisions for laying out highways within its own limits, and that each should pay all the expense of constructing the avenue on its own side of the river.   The natural and obvious conclusion from these different provisions, taken in connection with the power given to cross any railroad at grade, would seem to be that the Legislature intended to leave to each city separately all matters relating to the laying out and construction of the avenue on its own side of the river, including the crossing of any railroad at grade or otherwise, and that therefore the question whether the avenue should cross the railroad at grade or not was for the city of Cambridge, and not for the railroad commissioners, to decide.   The power to cross at grade being given, the presumption must be, in the absence of any contrary provision, that it was given to the party authorized to lay out the avenue, and not to some one else.   Moreover, unless this was so, the authority to cross at grade would seem to be superfluous, as, without it, the railroad commissioners could refuse or permit a grade crossing.   Pub. Sts. c. 112, § 125.   Jurisdiction over the details of a railroad crossing, such as fencing, sign-boards, cattle guards, planking, and gates, was taken from the county commissioners, and possibly from the local authorities, and given to the railroad commissioners, as presumably the better tribunal to deal with them in this instance.   Pub. Sts. c. 112, §§ 115, 124, 164, 166.   St. 1853, c. 151.   To some extent this has since been done by general laws.   St. 1882, c. 162.   St. 1888, c. 240.

It is conceded by the board of railroad commissioners that the power to locate includes the power to fix the grade, and this is not denied by the counsel for the city of Boston, or for the Boston and Albany Railroad Company.   The word " locate " seems to have been used in numerous instances as equivalent to " lay out," and to include like that the power to fix grades; and we think this is a reasonable construction.   *Commonwealth* v. *Coombs,* 2 Mass. 489.   *Commonwealth* v. *Great Barrington,* 6 Mass. 492. *Commonwealth* v. *Stockbridge,* 13 Mass. 294.   *Taylor* v. *County Commissioners,* 18 Pick. 309.   *Goodwin* v. *Marblehead,* 1 Allen, 37.   *Hyde Park* v. *County Commissioners,* 117 Mass. 416,

422.  *Richards* v. *County Commissioners*, 120 Mass. 401.  Rev. Sts. c. 24, § 9.  Pub. Sts. c. 49, § 13.  On the other hand, to speak of the manner of crossing as one of the "details" of the crossing, when the expense of an overhead crossing, and its effect upon the grade of the avenue, upon its construction, and upon the rights of abutters and their liability for betterments, are considered, seems to us manifestly incongruous, and we cannot believe that the Legislature used the word in any such sense. The manner of crossing is the principal point at issue.  Compared with it, all other matters relating to the crossing are unimportant and trivial.  It cannot, therefore, be justly spoken of as a "detail."

Nor do we think that the construction which we thus give to the act is open to the objection that it is at variance with the policy of the Commonwealth in regard to grade crossings.  For many years there has been a growing indisposition to permit such crossings, which has culminated in the passage of the St. of 1890, c. 428, providing for their abolition.  But during all this time the Legislature has in numerous instances, for particular reasons, in special cases permitted railroads to cross highways at grade; and in the present instance there were, doubtless, what the Legislature deemed good and sufficient reasons for permitting the crossing at grade.

Some reference has been made to the fact, that § 6 of the statute of 1882, as originally reported to the Legislature, read, "said avenue shall not cross at grade any railroad operated by steam," and was amended on its passage by striking out the words "shall not" and inserting the word "may"; and it has been attempted to draw therefrom an argument in favor of the jurisdiction of the railroad commissioners.  If this were important, or material, we should be inclined to hold that, instead of furnishing an argument in favor of the jurisdiction of the railroad commissioners, it strengthens the view that the purpose of the Legislature was to confer upon the city of Cambridge the power to decide whether the crossing should or should not be at grade.

The conclusions which we have thus reached in regard to the power of the city of Cambridge to act separately, and to fix the grade under the statute of 1882, render it unnecessary to consider the effect of the St. of 1890, c. 338, although we may re-

mark that it does not seem to us to be open to the objection that it takes away any vested rights belonging to the city of Boston, or to the Boston and Albany Railroad Company. See *Attorney General* v. *Cambridge*, 16 Gray, 247; *Hingham & Quincy Bridge* v. *Norfolk*, 6 Allen, 353; *Agawam* v. *Hampden*, 130 Mass. 528. Upon the question whether it is an attempt on the part of the Legislature to exercise judicial powers there is more doubt, and we refrain from expressing an opinion. See Cooley, Const. Lim. (5th ed.) 93, 94; *People* v. *Supervisors of New York*, 16 N. Y. 424; *Cambridge* v. *Boston*, 130 Mass. 357.

The only remaining question is as to the form of remedy, and we think it should be certiorari, and not mandamus. The commissioners did not refuse to act in the matter of fixing the details. They entertained the petition, heard the parties, proceeded to a decision, and caused it to be communicated to those interested. The most that can be said is, not that they refused to act, but that in acting they acted upon an erroneous construction of the statute. They had jurisdiction to prescribe the details of the crossing. They have, under an honest claim that the matter is a "detail," passed an order that the petitioner shall carry the avenue over the railroad, and allege that the petitioner should execute the order. We do not see how this can be treated as a refusal to do what the statute, when properly expounded, requires them to do. It is more like the erroneous judgment of a court. The board of railroad commissioners is analogous to that of the county commissioners. It has a sworn clerk, whose duty it is to "keep a full and faithful record of its proceedings." Pub. Sts. c. 112, § 9. Its duties are not simply ministerial, but to some extent judicial. It may summon witnesses, administer oaths, take testimony, and, after notice to parties, adjudicate upon certain matters that may be submitted to it. Pub. Sts. c. 112, §§ 17, 25. Under the St. of 1885, c. 85, it may, after notice and hearing, apportion the expense of maintaining interlocking signals where one railroad crosses another, its award being subject to revision every five years. Under the St. of 1885, c. 194, § 2, it may do in Boston what county commissioners are authorized to do in the rest of the State, entertain and act upon petitions for the separation of grades when a railroad and highway cross at grade. Under the St. of 1887, c. 430, it may

receive and act upon petitions of railroads for changes in their alignment, subject to the provisions of the Pub. Sts. c. 112, and all general laws now or hereafter in force relating to the laying out, taking land, or the payment of damages. While it has no power to enforce its decisions, they may, in certain instances, of which this is one, be made the foundation of equity proceedings to carry them into effect. St. 1885, c. 110. For these reasons, therefore, that the action of the commissioners cannot be justly treated as a refusal to prescribe the details of the crossing, and that their order is more in the nature of an erroneous judgment in judicial proceedings than a discharge of purely ministerial functions, we think certiorari is the proper remedy.

In coming to the conclusions reached above as to the construction to be given to the statute of 1882, we have not taken into account the evidence which was introduced against objection, and the question arising upon its admissibility becomes, therefore, immaterial. It is apparent, also, that the order of the commissioners was based, not upon any findings of fact, but upon their construction of the statute, and we have not, therefore, considered the effect to be given to their findings, if any, on questions of fact.

The result is that the petition for mandamus will be dismissed, and upon the petition for certiorari the writ will be ordered to issue.

*Ordered accordingly.*

*G. Putnam & C. J. McIntire,* for the petitioner.

*Samuel Hoar,* for the Boston and Albany Railroad Company.

*J. B. Richardson,* for the city of Boston.