Burke, J. (dissenting).
The issues on this appeal involve determinations in regard to the nature and validity of the rights and obligations of the RaceAvay and the State of New York which stem from a relationship formed by them in connection *320 with an enterprise undertaken by the Raceway pursuant to an amendment of the Pari-Mutuel Revenue Law enacted in 1956.
Until 1939 the Constitution of the State of New York prohibited gambling in this State. By a constitutional amendment, the Constitution was amended to except from the ban on gambling “ pari mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government ’ ’.
The constitutional amendment thus delegated to the Legislature constitutional power to prescribe pari-mutuel betting with only one specific direction, viz., to raise therefrom a reasonable revenue.
Since its enactment in 1940 the Harness Horse Racing Act has required (Pari-Mutuel Revenue Law, § 45) that 85% of the pari-mutuel betting total be distributed to the holders of winning tickets. The remaining 15%, which has always been deposited in the corporation’s own name in a bank of its own choosing in this State, constituted business income of the corporations operating the race tracks. Out of their 15% the corporations have been required by the statutes to pay certain percentages (graduated as to amounts and changed from time to time by amendments to the act) to the State “'as a reasonable tax by the state for the privilege of conducting pari-mutuel betting”. In 1956 the Legislature, recognizing that the then existing tax rates had made it uneconomic for tracks to modernize and expand (§ 45-a, subd. 1), and exercising a right delegated to it by the constitutional amendment, offered to reduce any of the then seven harness tracks’ rate of taxes by providing, subject to certain conditions, that, as to betting receipts in any year in excess of the total for 1955, the tax rate should be reduced by one half.
The reduction effected by the 1956 law (Pari-Mutuel Revenue Law, § 45-a) was subjected as we said to two conditions subsequent: first, that it would not be available to any corporation unless and until the total taxes held by all the track operators for a given year exceeded the totals for 1955; and, second, that the harness racing corporation could receive the benefit of the reduction only if it expended amounts for capital improvements which were approved by the Racing Commissioner. Both those conditions were, of course, for the benefit of the State. Inas *321 much, as it was impossible to determine until the end of each calendar year whether the amount of the State’s taxes from all tracks equalled those of the base year 1955, as the tracks conduct their race meetings through the year, the new statute required that each corporation hold in a separate bank account in its own name till the end of the calendar year an amount equal to half the excess over 1955 levels of taxes at the old rate (§ 45-a, subd. 5, par. [a]). The. 1956 law does not provide for the deposit of any part of the State’s taxes in the special account. At the end of each year any such corporation which had completed improvement to the satisfaction of the Commissioner (if at that time the State’s revenue from all tracks equalled that of 1955) was permitted to take over this bank account and to continue in each year when the revenue exceeded 1955 to do the same, until the amounts received by it from those special accounts, less Federal income taxes thereon, should equal the cost of the improvements. The moneys which a track is not required to pay to the Tax Commission was to be held for its own “ use and purposes ” and, unless and until the track is required to make a payment to the Tax Commission, no tax is levied (§ 45-a, subd. 9, par. [a]). Since the construction account funds were federally taxed income to the track corporation, the latter actually benefited to the extent only of the reduction amount net after Federal income taxes. Accordingly, the credit of construction account funds, which could be retained by the tracks, less Federal income taxes thereon, was to continue till the total therefrom equalled the cost of its improvement. In opinions given to the Legislature and the Governor, the then Attorney-General declared that the moneys in the construction account were not State moneys and that the bill as passed by the Legislature was constitutional.
Respondent .thereafter in 1956-1957, with the approval of the Commission, expended $19,517,469.92. Ten million dollars was borrowed from banks. In three years respondent’s new plant yielded over $7,000,000 more in taxes than the State had received at the 1955 level. "When, however, the respondent, pursuant to the law, sought the credit for the payment of Federal income taxes paid by it on the construction account moneys received by it, the Harness Racing Commission disallowed it in accordance with an opinion of a new Attorney-General, but continued to authorize the making of capital improvements.
*322 In 1959, after the commencement of this proceeding, the State Legislature, at a one-day extraordinary session, attempted to cancel unilaterally the ‘1 income tax ’ ’ provision of the 1956 law through a “ clarifying ” act (L. 1959, ch. 881, § 7, amdg. § 45-a, subd. 10; § 10) to the effect that the Legislature had not intended that the tracks should be “ reimbursed ” for income taxes and that thereafter there should be no such ££ reimbursements ”,
In the present proceeding we are concerned only with those construction moneys which according to both the laws are not payable to the Tax Commission but are to be retained by the tracks.
The courts below found that the 1956 law provided in clear and unambiguous language that the respondent is entitled to retain such construction account moneys until the amount thereof, less Federal income taxes paid by the track on such moneys, equals the cost of the improvements. The contention is now made that this interpretation ignores the <£ clarification” of the 1956 statute by the terms of the 1959 law which forbids the credit of income tax moneys. The respondent in its reply to the answer alleges that the 1959 law is ineffectual and, if it is construed to forbid such credits, is void.
The dispute between the Commission and the respondent concerned the interpretation of language in subdivision 10 of the 1956 law that each capital improvement track should retain such construction account moneys in each calendar year in which the State’s taxes from the track and .all tracks equal those received by the State therefrom in 1955 “until such date as the amounts paid to such harness race track from the construction account, less income taooes paid thereon to the United States by such harness race track, equals the cost of the capital improvement as determined by the state harness racing commission. The capital cost of improvements shall not be deemed to include interest on indebtedness, real estate taxes or insurance premiums. In determining the amount of taxes paid by any such harness race track to the United States in any calendar year it shall be deemed that said accounts were taxed at the highest rates actually paid to the United States by-such harness race track for the particular year involved ” (emphasis added).
*323 In appellant’s view the meaning of this provision would limit the respondent to the payment of such extra portion of the withheld moneys from the over-1955 bets only until the date when the amount of all moneys so retained by respondent from such extra portion equals the cost of its capital improvements.
The language of subdivision 10 of the 1956 law is plain and unequivocal and it does not mean what the Attorney-General stated it does. The Legislature has not used language which is difficult to understand. The provisions as to income taxes meant exactly what it said: that the track could continue to use its construction fund to pay for the improvements until the total dollars recaptured, less income taxes, was equal to the total in dollars expended for the improvements. In other words, the reimbursement was not to cease until the full cost of the capital improvements to the tracks shall have been repaid. This full cost was not just the amount in dollars expended for capital improvements, but that amount plus the income taxes paid at the time of the acquisition of the dollars needed to pay the construction or to repay the banks for the loans necessary for the completion of the project.
Such a construction of the statute, it is argued, is in conflict with the terms of the 1959 law which is said to be either a clarification or amendment of the earlier statute. The purported clarification of the 1956 statute even if it could be deemed valid cannot be given retroactively the effect expressed by the Attorney-General (City of New York v. Village of Lawrence, 250 N. Y. 429; People ex rel. Mutual Life Ins. Co. v. Board of Supervisors, 16 N. Y. 424, 431, 432). Since the language of the statute is plain, and the intent clear, there is no power in the Legislature to impose on the courts its interpretation which in the guise of a clarification is set forth in the later statute. The excising of language from the 1956 law and the insertion of provisions in the 1959 law which radically changed the prior legislation, the language of which was perfectly clear, can hardly be characterized as a clarification. People ex rel. Westchester Fire Ins. Co. v. Davenport (91 N. Y. 574, 592) and Matter of Chatlos v. McGoldrick (302 N. Y. 380) do not assist the appellant. In those cases the clarifying amendment did not change unambiguous language of the original statute in order to cut out a purpose clearly expressed in the original statute.
*324 If, moreover, the 1959 statute is regarded as involving a prospective change of respondent’s rights under the 1956 statute, it would be invalid as it represents an unconstitutional impairment of the State’s contractual obligation.
The 1956 legislative enactment contained provisions which when accepted as a basis of action by a track became a contract between it and the State which was constitutionally protected from impairment by subsequent legislation.
In New Jersey v. Yard (95 U. S. 104) the Supreme Court said (p. 114):
“ The difficulty in this class of cases has always been to distinguish what is intended by the legislature to be an exercise of its ordinary legislative function in making laws, which, like other laws, are subject to its full control by future amendments and repeals, from what is intended to become a contract between the State and other parties when the terms of the statute have been accepted and acted upon by those parties. This has always been a very nice point; and, when the supposed contract exists only in the form óf a general statute, doubts still recur, after all our decisions on that class of questions.
“ These doubts are increased when the terms of the statute relate to a matter which is in its essential nature one of exclusive legislative cognizance, and which at the same time requires money or labor to be expended by individuals or corporations. In such cases, the legislature may be supposed to be merely exercising its power of regulating the burdens which are to be borne for the public service, in which case it could be modified from time to time as legislative discretion might determine; or it might be a contract founded on a fair consideration moving from the party concerned to the State, and which in that case would be beyond the power of the State to impair.”
Any doubts that the undertaking joined in by the State and the respondent under the terms of the 1956 statute was contractual in nature are dissipated by the acknowledgment by the . 1959 Legislature that an obligation subsisted for the reimbursement of the cost of the capital improvements borne by the tracks. The 1959 Legislature did not repudiate the obligation, it reaffirmed it. Capital improvement tracks would not be “ entitled ” to reimbursements unless a legal obligation binding on the State had been created by the 1956 law. The 1959 legis *325 lation confirms a conclusion that the 1956 legislation was not a general tax statute. The law in appearance and substance has all the elements of a contract. An offer was addressed to a specific party and a promise made to that party that, if it was approved by the State and if it completed improvements which had to receive a State certification, it would be reimbursed. In this case the elements of a contract are clearer than they were in Russell v. Sebastian (233 U. S. 195) and New York Elec. Lines v. Empire City Subway (235 U. S. 179). In Russell (supra) the gas company prevailed in its contention that its commencement of a pipeline construction gave rise to a contractual right. Here, respondent’s construction of a capital improvement at a cost of $19,000,000 under the 1956 law has been fully completed. In New York Elec. Lines (supra) Mr. Justice Hughes stated (p. 193): “These municipal consents are intended to afford the basis of enterprise with reciprocal advantages. * * * They are made and received with the understanding that the recipient is protected by a contractual right from the moment the grant is accepted and during the course of performance as contemplated, as well as after that performance.”
In these similar circumstances, the consent and certification obtained by the respondent from the State acting by the Commissioner pursuant to the 1956 law has the same legal effect of establishing respondent’s contractual rights. The 1956 law was not addressed indiscriminately to a large group of corporations. The State offer in the 1956 law was addressed only to those of the seven licensed harness race tracks of this State which, with the approval of the Commission, completed improvements. Thus the 1956 law singled out the persons to receive rights thereunder by the performance of certain acts. Under the 1956 law not only was the consideration to be received by the track closely related to what was done by it for the State, but the approval of the construction of capital improvements by a State agency, the Commission, was required before a track could qualify to receive such consideration. Paragraphs (a) (el. [1]) and (b) of subdivision 6 of the 1956 law show that legal obligations were being imposed on the State. In those provisions the 1956 Legislature has stated that capital improvement tracks are “entitled” to their construction account moneys.
*326 Wisconsin & Michigan Ry. Co. v. Powers (191 U. S. 379), People ex rel. Gallatin Nat. Bank v. Commissioners (67 N. Y. 516) and People v. Roper (35 N. Y. 629) are not applicable under circumstances comparable to those here present. In this instance the terms of the 1956 law and the circumstances surrounding its enactment evidence a purpose on the part of the Legislature to bargain with the track for a fair consideration for the benefit of the State of New York.
Section 1 of article XVI of the New York State Constitution which authorizes the Legislature to repeal tax exemptions and the deliberations of the 1938 Constitutional Convention which were directed to tax exemptions such as that which had been granted to the owner of the land under the Chrysler Building in New York City are equally irrelevant. “ The question is as to the existence and nature of the contract and not as to the construction of the law which is supposed to impair it.” (Indiana ex rel. Anderson v. Brand, 303 U. S. 95, 100.) In any event, appellant’s interpretation of the law is inadmissible. The argument in support of the validity of the 1959 amendment of the 1956 law assumes (contrary to a legislative finding that the State prior to its enactment had ‘1 lost substantial revenues and income ” because of the limited facilities of the tracks) that section 45-a, added by the 1956 law, had the effect of relieving the race tracks from a given portion of tax they otherwise would have had to pay under the then existing tax schedules and, as such, it was a tax exemption. The assumption is, of course, baseless. The then existing tax schedules applied to the “ inadequate ” tracks at which “ the number of admissions ” and “ the sum a deposited in pari-mutuel pools ” were limited to the detriment of the State revenues. A track cannot under section 45-a reduce its taxes by making improvements. On the contrary, the track by making improvements creates the possibility that it will have to pay additional, not less, taxes. The Legislature did not promise lesser taxes, what the State did was to promise the tracks that they would be reimbursed for the cost of the capital improvements out of a portion of the moneys withheld from the over-1955 bets which, if it materialized, obviously was money which had never been subject to the existing tax schedule. Indeed, there is no language in the 1956 law which promises tax exemption to the tracks or yields a taxing power. Under *327 the 1956 law the State was left free to raise its rate of tax in the future. The fact that the 1956 law provides for the retention by capital improvement tracks of a portion of the moneys withheld from the over-1955 bets cannot be regarded as tax exemption. What was accomplished was an adjustment in tax rates which the Legislature could have made unconditionally but for which it chose to bargain and attach conditions so as to assure the State benefits through increased betting at improved, larger race tracks. Where there is an unconditional reduction the Legislature is free to alter the rates. Where, however, the State’s bargain provides that the maximum amount of the construction account moneys which may be retained by a capital improvement track in any one year in reimbursement for its improvement costs shall be exactly equal to the additional amount over the base tax which a track pays the State in that year, the State has specifically invited a quid pro quo. It has not granted a tax exemption.
In Indiana ex rel. Anderson v. Brand (303 U. S. 95,100, supra) the court described such an arrangement in this manner: “ If the people’s representatives deem it in the public interest they may adopt a policy of contracting in respect to public business for a term longer than the life of the current session of the legislature.”
The 1939 pari-mutuel amendment to the State Constitution (art. I, § 9) specifically vested the Legislature with power to do what it deemed desirable in order to raise revenue from pari-mutuel betting. It thereby empowered the Legislature to contract with the tracks as it did pursuant to the 1956 law. This contract, unlike a tax exemption, was intended to and did produce more revenue for the State. By its terms it could only increase but could not decrease the State’s revenue. Section 1 of article XVI of the New York State Constitution is not, therefore, applicable.
The 1959 law did not, as appellant would have us believe, impose a tax. It makes no attempt to exercise the taxing power. It seeks to change the promise made by the 1956 Legislature to the capital improvement tracks that, if they qualified for construction moneys by investing their own money and completing improvements founded by the Commission to be such as 1 ‘ will ultimately add to the revenues of the State ”, the tracks would *328 be reimbursed for the full cost to the tracks of the improvements from moneys withheld from the over-1955 bets (see Pari-Mutuel Revenue Law, § 40). This promise recognized that each dollar of income of the tracks out of the portion of the over-1955 bets would not be sufficient, for instance, to repay a dollar of a bank loan used to pay for the construction. Hence, an allowance, in equity, had to be made for the income tax imposed on each dollar of earnings. The 1959 legislation did not raise the rate of existing taxes or impose new taxes. It does try to rewrite a contract. This alteration in the terms of the contract would authorize the State, after accepting the benefits of respondent’s investment, to pay the acknowledged debt in a “ coin ” different in kind to the “coin” the respondent had expended and the “ coin ’’which the State specifically stipulated would be restored. In brief, the State, which had agreed that the respondent would be repaid in full dollars, unilaterally decreed, in effect, that it would be charged with full dollars but repaid in half dollars. According to the reasoning of the appellant the amendment could have validly required the respondent to accept worthless currency for the discharge of an obligation the existence of which the 1959 law affirmed. Such a change in the consideration is manifestly an unconstitutional impairment of a legislative agreement.
The 1959 statute is, therefore, invalid, breaching what is under all these circumstances not a general tax statute, but the terms of a contract offered to a small group of tracks in whose business the State has an unusually large interest, and which exist by State license only, and on the faith of which this respondent borrowed and expended large sums for capital improvement approved by the State itself (U. S. Const., art. I, § 10; Danolds v. State of New York, 89 N. Y. 36, 45; New York Elec. Lines v. Empire City Subway, 235 U. S. 179, supra; Russell v. Sebastian, 233 U. S. 195, supra; American Smelting Co. v. Colorado, 204 U. S. 103; Brooklyn Bus Corp. v. City of New York, 274 N. Y. 140). “ When the state through its legislature grants a franchise, privilege or exemption to a corporation either in the act incorporating it, or by other legislation followed by action of the corporation under or in reliance upon the grant so made, it constitutes a contract, based on a valuable consideration, the obligation of which cannot be impaired by subsequent legisla *329 tion.” (People ex rel. New York Cent. & H. R. R. R. Co. v. Mealey, 224 N. Y. 187, 196-197, affd. 254 U. S. 47.) That rule is directly applicable here. The principle — that subsequent legislation cannot take away rights promised by prior legislation, especially after the promisee has acted in reliance upon the promise — protects respondent. Legislation by the State which violates section 10 of article I of the United States Constitution is violative of the due process clause of section 6 of article I of the State Constitution (Central Sav. Bank v. City of New York, 280 N. Y. 9, cert. denied 306 U. S. 661).
Hence the offer, accepted and acted upon, brought into existence an irrevocable contract. The inviolability of contracts, and substantive due process, require the enforcement of the contract.
The order of the Appellate Division should be affirmed.
Judges Van Voorhis and Foster concur with Judge Fuld ; Judge Dye concurs in a separate opinion; Judge Frobssel dissents in a separate opinion for modification; Chief Judge Desmond and Judge Burke dissent in separate opinions for affirmance.
Order reversed and matter remitted to Special Term for further proceedings in accordance with the opinion herein, without costs.