BOSTON EDISON COMPANY *vs.* BOARD OF SELECTMEN OF CONCORD

(and two companion cases [1]).

Suffolk. October 10, 1968. — December 19, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Certiorari. Public Utilities. Electric Company. Evidence*, Presumptions and burden of proof, Before selectmen. *Words*, "Incommode."

A hearing under G. L. c. 166, § 22, by the selectmen of a town upon a petition by an electric company for permission to cross certain public ways therein with its power lines was quasi judicial, and thus one of the requirements for certiorari review of the selectmen's action on the petition was satisfied. [83–84]

Three petitions by an electric company for writs of certiorari to correct errors of law allegedly committed by the selectmen of three towns respectively in denying, after hearings under G. L. c. 166, § 22, permission to the petitioner to cross certain public ways therein with its power lines were not precluded on the ground that the petitioner had not exhausted its administrative remedies, where it appeared that the only administrative proceeding to overrule the selectmen's actions would have been one before the Department of Public Utilities under § 28, and such a proceeding would have been futile since requirements for the application of that section obviously could not be fulfilled. [84–85]

An electric company, denied permission by the selectmen of a town under G. L. c. 166, § 22, to cross certain public ways therein with overhead high tension wires, had under § 21 an interest in the use of such ways which was adversely affected by the selectmen's decision,

---

[1] Boston Edison Company *vs.* Board of Selectmen of Sudbury.
Boston Edison Company *vs.* Board of Selectmen of Wayland.

so that relief to the company by certiorari was not to be denied on the ground of absence of substantial injury to the company by that decision [85]; there was no merit in a contention that the company would not be injured by that decision in view of the necessity of the company's obtaining permission from the Federal government to cross a wildlife reservation, where it appeared possible that the company could obtain such permission, or in view of prohibitions in the town's zoning by-law, where it appeared that the company had already secured, subject to judicial challenge, exemptions therefrom by the Department of Public Utilities under G. L. c. 40A, § 10 [85–86]; nor was there merit in a contention that the facts, that an expired contract between the town and the company had required it to place its wires underground and that its practice had been to do so, showed that it would not be injured by being compelled to do so [86–87].

Discussion of the legislative history of G. L. c. 166, §§ 21 and 22, and pertinent case law, and conclusions reached that, giving a broad connotation to the prohibition in § 21 that an electric company "shall not incommode the public use of public ways," the aldermen of a city or the selectmen of a town have a large measure of discretion as to whether to grant permission to an electric company to cross public ways with its power lines, and that their exercise of such discretion should not be disturbed unless it was arbitrary or unreasonable. [88–91]

Under the provision of G. L. c. 166, § 21, that an electric company "may" construct lines for the transmission of electricity "across the public ways . . . but such company shall not incommode the public use of public ways," an electric company, upon applying to the selectmen of a town under § 22 for permission to cross public ways therein with its power lines, had the burden of proving that its lines would not "incommode" the public and, in a certiorari proceeding attacking a denial of such permission, of demonstrating that the selectmen's decision was, as matter of law, not sufficiently supported by evidence. [91–92]

Statement of what is evidence sufficient as matter of law to support action complained of in a certiorari proceeding. [92]

Denials by the selectmen of three towns, upon hearings under G. L. c. 166, § 22, of permission to an electric company to construct overhead high tension lines across certain public ways therein were supported by pertinent evidence respecting prospective increased public use of one of the ways to be crossed, aesthetic considerations, psychological disturbances, danger from falling or sagging wires, danger from radiation, decline in market values of homes near the proposed lines, creation of an attractive nuisance for children, and possible danger to birds and animal life, and, in certiorari proceedings brought by the electric company to quash the decisions, it was held that such evidence warranted the selectmen's denials and that relief could not be afforded to the company, regardless of whether the selectmen employed their general discretion or the discretion given them by a broad interpretation of the word "incommode" in the prohibition in § 21 that an electric company "shall not incommode the public use of public ways." [93]

PETITIONS for writs of certiorari filed in the Supreme Judicial Court for the county of Suffolk on October 10, 1967.

The cases were reserved and reported by *Reardon,* J., without decision.

*Donald R. Grant* for Boston Edison Company.

*Philip B. Buzzell* for Board of Selectmen of Sudbury.

*Will J. Bangs* for Board of Selectmen of Concord.

*Thomas F. Myles,* for Board of Selectmen of Wayland, joined in a brief.

REARDON, J.   These are closely similar petitions for writs of certiorari brought by Boston Edison Company (Edison) to quash decisions and votes by the boards of selectmen of Concord, Sudbury and Wayland which denied Edison permission to cross certain public ways in those respective towns with its high tension wires.   Each of the petitions was reserved and reported by the single justice. This case is the third in a sequence which commenced in 1960 with the efforts of Edison to build a 7.48 mile, 115,000 volt line through the three towns.   We are confronted with a certain number of procedural points and a somewhat difficult issue of statutory construction.   There have come to the full court numerous exhibits, as well as the transcripts of hearings before the boards of selectmen upon the petitions by Edison for the requisite permissions to cross the public ways with its wires.   The basic facts are largely uncontroverted and may be stated as follows.

The proposed overhead lines would run from the Edison substation in Sudbury through the three towns to a proposed new substation in Maynard.   The new lines, designed for operation at 115,000 volts, will consist of three separate and appropriate circuits to be constructed beginning in 1969. Some fifteen overhead wires will be suspended by conductors from the cross-arms of wood poles.   It is proposed that no pole will be located within the limits of any public way and that no part of any wire will be lower than thirty feet above the surface of each way.   The poles will range in height from fifty-five to ninety-five feet.   The wires will in no instance run along a public way and will generally cross the public

ways at right angles. Edison has not yet made requests of State and Federal authorities to cross certain lands and reservations under their jurisdictions. There has been a unanimity of opposition from the three towns on this project which was clearly made manifest in the hearings.

The issues before us are, first, whether certiorari is available to correct the action of the respective boards of selectmen in their refusal to grant Edison permission to cross public ways and, second, if certiorari is available to Edison whether there was sufficient evidence to support the denial by the selectmen of Edison's request for the crossing rights.

I. The availability of certiorari.

The permissions which Edison sought and was refused are authorized under G. L. c. 166, §§ 21 and 22. Since electricity is a State regulated public utility under G. L. cc. 164 and 166, certain permissions must be obtained prior to the erection of power lines. There is no particular order in which these permissions are to be obtained. *Sudbury* v. *Department of Pub. Util.* 351 Mass. 214, 224 (the second *Sudbury* case). See *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428 (the first *Sudbury* case). Section 21 of c. 166 provides that "[a] company incorporated for the transmission of . . . electricity . . . may . . . construct lines for such transmission . . . across the public ways . . . but such company shall not incommode the public use of public ways or endanger or interrupt navigation." Section 22 required the company (Edison) to petition the selectmen of the several communities where the street crossings were contemplated. Under that section public hearings were held after which the selectmen were empowered "by order [to] grant . . . a location for such line." It is their refusal to do so that Edison seeks to quash by certiorari.

Although certiorari is provided for by G. L. c. 249, § 4, its origins are in the common law, and the requirements which give it life were stated in *Swan* v. *Superior Court*, 222 Mass. 542, 544. Speaking of the writ, the court said, "Its common purpose is the beneficent one of enabling a party who has no remedy by appeal, exception, or other mode of

correcting errors of law committed against his rights in a proceeding judicial or *quasi* judicial, to bring the true record, properly extended so as to show the principles of decision, before a higher court for examination as to material mistakes of law. Its appropriate function is to relieve aggrieved parties from the injustice arising from errors of law committed in proceedings affecting their justiciable rights when no other means of relief are open. It always has been recognized as a highly remedial salutary procedure, founded upon a sense of justice, to relieve against wrongs otherwise irremediable." See *Gifford* v. *Commissioner of Pub. Health,* 328 Mass. 608, 619, and cases cited. Therefore, the requisite elements for availability of certiorari are (1) a judicial or quasi judicial proceeding; (2) a lack of all other reasonably adequate remedies; and (3) a substantial injury or injustice arising from the proceeding under review.

A. Were the hearings before the selectmen either judicial or quasi judicial?

In the hearings on the Edison petitions the selectmen in each instance under the statute were called upon to exercise judgment and discretion. In each of the three towns hearings were held where opposing points of view were presented. We may refer by analogy to the State Administrative Procedure Act, G. L. c. 30A, which, while it does not apply to actions by towns, defines in § 1 "an adjudicatory proceeding" as "a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." See *Cambridge* v. *Railroad Commrs.* 153 Mass. 161, 169–170 (the order of the Board of Railroad Commissioners for a city to construct an overpass was quasi judicial); *New York Cent. R.R.* v. *Department of Pub. Works,* 354 Mass. 332, 333–335 (a decision not to allow a requested grade crossing was in an adjudicatory proceeding). That the selectmen may exercise some ministerial function does not mean that their proceedings concerning the Edison petitions are not adjudicatory. Sudbury and

Wayland rely most heavily on *Locke* v. *Selectmen of Lexington*, 122 Mass. 290, a case which is not persuasive. There the court said, "The selectmen of a town are not a court, and, independently of the St. of 1873, c. 214, exercise no judicial functions which could be revised by writ of certiorari; but only powers which are purely executive or ministerial . . . ." The exception cited by the court, however, is a statute which provides for a hearing similar to that provided for in c. 166, § 22, and the case would seem to support the position that the hearings before the selectmen were indeed in adjudicatory proceedings.

B. Has Edison exhausted its other remedies?

Certiorari lies only where the petitioner has exhausted his administrative remedies. *Jordan Marsh Co.* v. *Labor Relations Commn.* 312 Mass. 597. *Saint Luke's Hosp.* v. *Labor Relations Commn.* 320 Mass. 467, 469–470, and cases cited. *Marshall* v. *Registrar of Motor Vehicles*, 324 Mass. 468, 471. Edison argues that review by the Department of Public Utilities (Department) is foreclosed because the case does not fulfill the requirements of G. L. c. 166, § 28, where an electric company denied the right to cross public ways may apply to the Department. In such an instance the Department is empowered to overrule the selectmen if the utility has already been granted road crossings and has accepted them in a majority of the towns through which the lines may pass or in two adjoining municipalities. Otherwise the Department is powerless to overrule the selectmen. The towns do not assert that Edison has fulfilled the conditions of the statute but rather that it is only the Department which can decide after a hearing whether or not Edison has.

On this point the prevailing view in other jurisdictions is that where an administrative agency cannot afford relief resort to the agency is not required. See 2 Am. Jur. 2d, Administrative Law, § 605. The futility apparent in the application of the statute makes such resort to the administrative agency unnecessary. *United States* v. *Knox*, 128 U. S. 230, 234. *Carter* v. *Bluefield*, 132 W. Va. 881, 892. This doctrine in our view should be applicable where a

threshold question will render application to an administrative body futile, for reasons of judicial efficiency if for no others. There is little to be gained by forcing Edison to a § 28 proceeding where the Department obviously can afford no suitable relief.

C. Was substantial injury or injustice incurred by Edison by reason of the action of the selectmen?

Edison claims substantial injury, to which the towns reply that Edison has no "private right" in the public ways — the use of which is a privilege and the revocation of which use gives rise to no injury. The argument of the towns in this regard is concerned with the distinction between "right" and "privilege," which has been under attack in recent years. See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439. Moreover, the Legislature acting under c. 166, § 21, which grants the rights in the public streets and a local board of selectmen which denies access to them are not the same. Therefore, it is not a question of the simple revocation of privilege by the body which created it but rather the denial of that privilege in adjudication by another body. As the court said in *Weld* v. *Board of Gas & Elec. Light Commrs.* 197 Mass. 556, 557, "It [the gas and electric company] enjoys public rights in the streets, which are derived from the Commonwealth, through action of the board of aldermen under authority of the Legislature." See *Cheney* v. *Barker,* 198 Mass. 356, 365–367 (mandamus may be had against a board of aldermen to permit opening a street). It would therefore appear that Edison does have an interest in the use of the streets which has been adversely affected by the decision of the selectmen.

It is also argued against Edison that before constructing its lines it needs permission from the Federal government to cross a wildlife reservation and must obtain permission from the towns in exception of their zoning by-laws. Neither of these will be forthcoming, say the towns, and thus no damage will result from denying crossing rights and certiorari does not lie. We must therefore decide whether there

is a sufficient possibility of obtaining the remaining permissions that the selectmen's decision, if not quashed, will substantially injure Edison. If the possibility exists that they will be obtained then Edison is injured in that it would be compelled to return later to this court with resulting expense and loss of time. In the interests once more of judicial efficiency it would seem that the possibility of later success on applications need not be very high to permit us to decide a case already briefed and argued on the merits. It is claimed that the letter from the Secretary of the Interior is conclusive that Edison will not be allowed to cross Federal land. We do not so read the letter. It says in part, "[W]e would not grant easements for running overhead lines over a part of the Great Meadows National Wildlife Refuge if doing so would significantly impair natural values, including scenery, or be inconsistent with the action of local government." We interpret this as establishing the possibility that the Department of Interior might grant permission for overhead lines if it decided such lines would not impair natural values. Even if the letter were unequivocal, 16 U. S. C. § 664 (1964) indicates that decisions made by the Secretary of the Interior are administrative and subject to judicial review under Pub. Law (89th Cong.) 89–554, 80 Stat. 392, 5 U. S. C. § 702 (Supp. II, 1966). It is impossible to prognosticate the outcome of such a review but that it exists suggests that it is less than clear that the necessary permission cannot be obtained from the Department of the Interior. Ergo, there remains a substantial possibility of injury. On the argument proffered by the towns that the selectmen under their own zoning by-laws were prohibited from granting Edison's petitions and, hence, there is no injury, it remains only to say that permissions to avoid such by-laws are obtainable from the Department under G. L. c. 40A, § 10, where in fact such permissions have already been obtained, although they too are being judicially challenged.

Lastly, the town of Concord argues that a preëxisting but expired contract between Edison and itself required that

wires be placed underground, and that, plus Edison's prior practice of putting wires underground, means requiring it to do so would not result in injury to Edison. This argument is obviously fallacious.

We conclude, therefore, that the requirements for certiorari are fulfilled, and we proceed to a consideration of the substantive questions raised.

II. Was there sufficient evidence to support the selectmen's denial of Edison's request for street crossing rights?

Edison contends that the evidence at the hearings was insufficient to warrant the refusal of its applications. The court will review on certiorari only errors of law. *Farmington River Water Power Co.* v. *County Commrs.* 112 Mass. 206, 212, 213. *Filoon* v. *City Council of Brockton,* 252 Mass. 218, 223. It is open to Edison to contend that the evidence which preceded the selectmen's action was "as matter of law insufficient to warrant such action, finding or conclusion." G. L. c. 249, § 4. If the selectmen acted on evidence insufficient as matter of law to justify their action, such action may be quashed.

A. The applicable standards.

The basic standard is to be found in G. L. c. 166, § 21. There it is stated that electric companies may cross streets with their lines but such companies "shall not incommode the public use of public ways or endanger or interrupt navigation." The parties differ in the meaning of that standard. Edison argues strongly that the Statewide scheme of regulation for utility lines implicit in the statutes limits the scope of inquiry of the local boards and that they should not be allowed to frustrate the general interest by refusing street crossings on grounds which the Department has already considered. Edison further claims that the scope of inquiry by the selectmen is limited to one of detail, not whether the crossing should be allowed or whether lines should be underground but where poles should be placed and how constructed, the sole purpose of the statute being to allow the selectmen to minimize physical danger and inconvenience. Concord has argued that "incommode" is to

be given a broader interpretation in that the second part of the sentence in its reference to "endanger . . . navigation" suggests this is not the sole test or the statute would have referred to endangering both the traveling public and navigation.

We are aided in our decision by reference to the legislative history of G. L. c. 166, §§ 21 and 22. The statute originated in St. 1849, c. 93, where the "incommode" clause appears substantially as it is today. Section 3, which has become c. 166, § 22, was much briefer. It said, "The selectmen of any town, or mayor and aldermen of any city, through which the lines of such company are to pass, shall give said company their writing, specifying where the posts may be located, the kind of posts that may be used, the height at which, and the places where, the wires may be run . . . ," and went on to allow later alteration of the location by the aldermen. There were several subsequent changes, one in 1903 where c. 237 made some modification in the wording of the earlier statute, but the change was not substantial. The public hearing requirements which had been inserted in 1860, Gen. Sts. c. 64, § 3, relative to later alteration of the location of the poles were here extended to the original petitions but only for the purposes of initial location of the poles. A significant change occurred in St. 1911, c. 509. The essential changes in the section were the provision for more formal hearing procedure, which increased the importance of the selectmen's consideration of a petition, and the change of the apparently mandatory "shall" to a discretionary "may." This later change was to conform with a previous court decision which had interpreted "shall" as "may," and where it was stated that it was not mandatory that the towns petitioned grant permission for street locations. *Suburban Light & Power Co.* v. *Aldermen of Boston*, 153 Mass. 200, 202. It would thus appear that local boards were being given greater discretion in determining whether a utility line should be allowed to locate in a public way at all, and the history of the 1911 statute change supports this interpretation. It grew out of a special report to the Legis-

lature made by the board of gas and electric light commissioners which was established by a resolve of the prior legislative session, Resolves of 1910, c. 55. That report, 1911 Pub. Doc. No. 35, as reported in 27 Gas and Electric Light Commissioners Report, pp. 314a–342a, was concerned in part with high tension transmission. The report said, at pp. 330a–331a, "Without undertaking to insist upon an exact limit, the Board is of the opinion that overhead lines operated at very high voltages should, so far as practicable, be kept off the streets. . . . [An] opportunity for conflict between the interests of different communities may arise with respect to high-tension transmission lines which must of necessity pass across or through one or more cities or towns to reach their destination. Such lines, even if built on private rights of way, cannot extend far without crossing public ways, for which locations from the local authorities are necessary. If such a line is plainly in the interest of the public in several communities, its construction should not be defeated or seriously hampered at the will of a single city or town." The clear implication of this language is that while one town should not be allowed to defeat the general interest of several towns, one town, or several towns acting in concert, could defeat the installation of lines relating only to them, especially where high tension lines are concerned.

Our reading of the legislative history is reinforced by reference to the case law, and the towns' discussion of the cases cited by Edison appears accurate. Although all of the cases deal with physical inconvenience, either implicitly or explicitly, none of them suggests that this is a necessary limit of c. 166, § 22. In fact, as one of the respondents points out, several of the cases imply precisely the opposite. In *Pierce* v. *Drew*, 136 Mass. 75, 78, the court said the local board could determine not only *where* but *whether* utility lines may be placed along the highways. In *Suburban Light & Power Co.* v. *Aldermen of Boston*, 153 Mass. 200, 204, the court said, "It cannot, we think, be inferred, as the plaintiff urges, that it was intended that it was not to be in the power

of local boards to defeat the operations of electric lighting companies the organization of which was authorized by statute. When we observe how many considerations, so far as the public is concerned, enter into the question whether the streets shall be used for electric lighting companies of a local character, . . . it is not readily supposable that in regard to companies whose operations were confined to a single town all that was intended to be left to the board of aldermen or selectmen were questions of detail only."

We conclude that both statutory history and case law impart to the selectmen a greater role than Edison concedes; how much greater a role remains somewhat unclear. Indeed, it is arguable from the authorities cited that the discretion of the local board is not circumscribed by the phrase "incommode the public use of public ways." Nothing makes the refusal of a board to grant crossings dependent upon such a finding, especially if the two sections of the statute are read separately. Undoubtedly, "incommode" is one of the factors which should be considered and a line which would "incommode" should not be permitted. It does not follow, however, that a line which does not "incommode" must be permitted. There is nothing in the statute which requires the local board to grant the crossing even if the line would not "incommode" and its decision might be upheld as long as it was not arbitrary nor capricious.

But it seems to us that even if "incommode" is adopted as a standard, that standard is to be read broadly in view of the foregoing. In fact the word itself carries broad connotations.[2] We do not feel inclined to adopt the restrictive meaning of "incommode" which has been urged upon us. We are not of the opinion that its application is limited to

[2] Definitions of "incommode" are given as follows: "To disturb or molest; to give inconvenience or trouble to; to put out." 42 C. J. S. 538.
"To give inconvenience or trouble to; to disturb or molest; to put out; to discommode; as incommoded by want of room." Webster's 2d Intl. Dictionary.
"Incommode is a limited word meaning to disturb or molest; to give inconvenience or trouble to; to put out." 20A Words & Phrases, 306.
"To subject to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience." Oxford New English Dictionary.

that which "may cause any insignificant physical inconvenience or danger to the traveling public." Various showings involving distinct molestation and annoyance were voiced at the hearings. We find nothing wrong in the selectmen's determination that such annoyances may involve aesthetics. The presence of power lines across a public way can, in our view, disturb natural beauty sufficiently to create real annoyance to the public users of the way, particularly in a day when such beauty seems to be a rapidly diminishing public asset.

Where review by the Department is not available under c. 166, § 28, certiorari is available but it does not give the court the power to judge the local authorities' decision by the same standard of review which the Department would apply. Rather the court should overrule the selectmen only if there is a lack of substantial evidence to support a finding of incommodity in the broadest sense. The case law and legislative history support giving the local authority a large measure of discretion. It should not be overruled unless it has behaved arbitrarily or unreasonably.

B. Was the evidence presented at the hearings sufficient as matter of law to support the selectmen's decisions?

1. Who has the burden of proof at the hearings and upon judicial review? The selectmen, in discharging a quasi judicial function, can deny the construction of the lines unless such action would be arbitrary or unreasonable. As stated in *Ansell* v. *Boston,* 254 Mass. 208, 211, if the exception which permits the selectmen to refuse to grant crossings is part of the enacting clause, which by the above description it is, then the burden is on the proponent of the lines to demonstrate it is not within the excepting clause. In *Almeida Bus Lines, Inc.* v. *Department of Pub. Util.* 348 Mass. 331, 342, it was stated that the burden is on the appealing party to show that a decision of the Department is invalid. The situation obtaining on these petitions is similar to that of the *Almeida* case and the burden was on Edison to establish a record sufficient to indicate the error of the local authorities. As a general matter Edison had the burden of demon-

strating that the lines would not "incommode" the public and demonstrating on review that it met that burden.

2. What is meant by evidence sufficient as matter of law?

General Laws c. 249, § 4, allows the petitioner to contend that "the evidence which formed the basis of the action complained of . . . was as matter of law insufficient . . . ." Although the language is different from that used in G. L. c. 30A, § 14 (8) (e), where the standard is "substantial evidence," the two would seem close enough that the law concerning the latter, which is more complete, could be applied by analogy. *International Harvester Co.* v. *Industrial Commn. of Wisconsin,* 157 Wis. 167, 175. "Substantial evidence" is defined in c. 30A, § 1, as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 548. *Consolidated Edison Co.* v. *National Labor Relations Bd.* 305 U. S. 197, 229. The standard is stated more fully by Professor Jaffe: "And so when a finding is attacked the judge must decide whether experience permits the reasoning mind to make the finding; he must decide whether the finding *could* have been made by reference to the logic of experience. He will conclude that the finding is unreasonable (either because it was badly reasoned or not the result of reasoning) when in his experience or in common experience as he knows it the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary." Jaffe, Judicial Control of Administrative Action, 598.

3. Does "experience permit the reasoning mind" to make the findings made by the selectmen from the evidence presented?

The transcripts of each of the three hearings and the examination of the exhibits reveal that most of the evidence and the controversy at the hearings were concerned with the subjects of economics and aesthetics. Edison's testimony was given largely through Leslie J. Weed, its engineer who testified at each hearing and submitted written reports. He described the proposed line and route, the specifications

and desirability of the proposed system, and gave it as his opinion that the line would not "incommode" the public. Statements were also made at each hearing by counsel for Edison. Objections by those opposed to granting the petitions were voiced along various lines: (1) increased public use of one of the roads to be crossed; (2) aesthetic considerations; (3) psychological disturbances; (4) danger from falling or sagging wires; (5) danger from radiation; (6) prospective decline in market values of homes near by; (7) attractive nuisance for children; (8) possible danger to birds and animal life. Upon our reading of the legislative and case law history, as well as our understanding of the meaning of "incommode," all of this evidence was pertinent. It is quite clear that all of the people present at the hearings, save for the proponents speaking for Edison, felt a high level of annoyance for various reasons. Reverting to our interpretation of "incommode," there would appear to have been ample evidence to allow the reasoning mind to conclude that these lines would "incommode" the public. Furthermore, we cannot say that aesthetic factors are not determinative in the light of the statutory history and our case law. See *Scenic Hudson Preservation Conference* v. *Federal Power Commn.* 354 F. 2d 608, 614–617 (2d Cir.). There is thus sufficient evidence to support the findings of the three boards of selectmen regardless of whether they are seen as employing general discretion or discretion within the interpretation of "incommode" which we have given.

We conclude that the order in each case should be

*Petition dismissed.*