BOSTON EDISON COMPANY *vs.* TOWN OF SUDBURY & others.[1]

Suffolk. November 4, 1969. — November 26, 1969.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Public Utilities. Electricity. Electric Company. Building Laws. Way,*
Public: electric lines, establishment. *Words,* "Regulation," "Ordinance."

Review of the legislative history of G. L. c. 164, § 72. [412–417]

A determination of public convenience and necessity by the Department of Public Utilities under G. L. c. 164, § 72, is a prerequisite to construction of an electric transmission line over a route in which the electric company already has an easement for the line. [411, 417–418]

The provision of G. L. c. 166, § 27, requiring approval by the Department of Public Utilities of a "regulation of a . . . town" affecting an electric transmission line between municipalities applies only to a regulation adopted by the town's selectmen under § 25, and not to a building by-law adopted by the town under c. 143, § 3. [419]

G. L. c. 143, § 3, does not authorize local regulation by a town's building by-law of the construction of an electric transmission line or its constituent structures. [420]

In the absence of any clear indication to the contrary, an order by selectmen granting a location for an electric transmission line across a public way under G. L. c. 166, § 22, must be taken to authorize substantially the kind of line contemplated in the proceeding leading to the order; and where the line so contemplated was a low voltage line supported on wooden poles the order did not authorize construction of a subsequently proposed line of much higher voltage supported on much taller latticed steel towers, and a location must be obtained for the proposed line under § 22 or § 28. [423, 424]

Where an electric company, after obtaining grants of locations across public ways for a low voltage transmission line supported on wooden poles, proposed to construct on the same route a line of much higher voltage supported on much taller latticed steel towers, the jurisdiction of the Department of Public Utilities under G. L. c. 166, § 28, with respect to granting locations for the proposed line depended on obtaining therefor the number of local grants of locations specified in § 28. [424]

A way in a town which had been open to public use and had been used for more than fifty years and had been kept in repair by the town for more

---

[1] The other parties to these proceedings, consolidated in the Superior Court, are the towns of Wayland, Sherborn, and Framingham, and the inspectors of buildings in Sudbury and Wayland.

than twenty-five years should be treated as a public way with respect to granting a location across it for an electric transmission line under G. L. c. 166, § 22 or § 28, even if there had not been full compliance with the requirements of G. L. c. 82, §§ 21–24, for its establishment as a public way. [425]

Construction of an electric transmission line in a town elsewhere than in public ways therein was not precluded by the fact that grants of locations with respect to such public ways had not been obtained under G. L. c. 166, § 22 or § 28; nor was such construction precluded by the last clause of c. 164, § 72. [425]

SIX BILLS IN EQUITY filed in the Superior Court on July 11, July 21, July 24, July 30, August 12, and September 24, 1969.

Following an order under G. L. c. 211, § 4A, transferring the cases to the Supreme Judicial Court for the county of Suffolk, they were reserved and reported to the full court by *Cutter, J.*, without decision.

The cases were submitted on briefs.

*James M. Carroll, Donald R. Grant & John J. Desmond, III*, for Boston Edison Company.

*Philip B. Buzzell & Joseph P. Warner* for the towns of Sherborn, Sudbury and Wayland; *Theodore Chase*, Town Counsel, for the Town of Sherborn; *John M. Kahn*, Town Counsel, for the Town of Framingham; *C. Peter R. Gossels*, Town Counsel, for the Town of Wayland; and *Earl F. Nauss, Jr.*, Town Counsel, for the Town of Sudbury.

*Robert H. Quinn*, Attorney General, *& William E. Searson, III*, Assistant Attorney General, for the Department of Public Utilities, amicus curiae.

CUTTER, J. The plaintiff (Edison) proposes to construct an overhead line for the transmission of electricity at 230,000 volts (230 KV) between an existing Edison substation in Medway and one in Sudbury. Questions concerning this or related transmission lines have been before this court in *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428 (the first *Sudbury* case), and 351 Mass. 214 (the second *Sudbury* case); in *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79 (the *Concord* case); and in *Framingham* v. *Department of Pub. Util.* 355 Mass. 138.

The general location of the proposed and certain related lines is shown on the attached sketch map (which does not purport to be drawn to scale).  The proposed line is to be on steel towers and is to run about seventeen miles over an existing route 250 feet wide, over which Edison has maintained one or more overhead transmission lines.  The Department of Public Utilities (D.P.U.) has made various past determinations of public convenience and necessity,

Street Crossing Legend:
A- Milford St.
B- Summer St.
C- Adams St.
D- Lovering St.
E- Winthrop St.
F- Hill St.
G- Norfolk St.
H- Central St.
I- Fiske St.
J- Whitney St.
K- Washington St.
L- Brook St.
M- Whitney St.
N- Curve St.
O- Western Ave.
P- Perry St.
Q- Prospect St.
R- Kendall Ave.
S- W. Central St.
T- Mill St.
U- Hartford St.
V- Worcester St.
W- Cochituate Rd.
X- Speen St.
Y- Lake Rd.
Z- Old Conn. Path
AA- Stonebridge Rd.
BB- Oak Hill Rd.
CC- Meadow View Rd.
DD- Stockfarm Rd.
EE-, Pelham Is. Rd.

Western Territory Transmission Connections of Boston Edison Company (Not drawn to scale)

Substation

affecting the route or parts of it, and various authorizations to make eminent domain takings of easements. Edison concedes, however, that these "do not include a specific authorization under . . . [G. L. c. 164, § 72, as amended] to construct the . . . [proposed] 230 KV line." The D.P.U. has specifically exempted the lands within the strip 250 feet wide and the proposed structures from the operation of the zoning by-laws of Medway, Sherborn, Framingham, Wayland, and Sudbury, to the extent that they may be used for the transmission lines described before the D.P.U. in its opinion (D.P.U. 15192, March 29, 1967).[2] See the *Framingham* case, 355 Mass. 138, 140–143, 145–148.

In the summer of 1969, Edison brought in the Superior Court declaratory proceedings against the building inspectors of Sudbury and of Wayland. The towns of Sudbury, Wayland, Sherborn, and Framingham (the towns and the building inspectors of two of them are, for convenience, collectively referred to as the towns) brought bills in the Superior Court against Edison for declaratory and other relief. This litigation, consolidated in the Superior Court (fn. 1), raises the issues discussed below. A Superior Court judge enjoined the building inspectors of Wayland and of Sudbury from enforcing the building codes of these towns respectively. He denied applications of these towns for preliminary injunctive relief against further construction by Edison.

On August 6, 1969, acting under G. L. c. 214, § 22, as amended by St. 1948, c. 309, a single justice of this court, in the county court, enjoined further construction of any part of the proposed line. The full court on October 3, 1969, denied Edison's petition to dissolve this order. Another

---

[2] The D.P.U. in that decision described the purposes of the proposed 230 KV line as "to relieve an anticipated deficiency in the transmission capacity . . . needed to meet the aggregate electrical loads in . . . Sudbury, Wayland, Waltham, Lexington, and Woburn, to strengthen the western side of . . . [Edison's] transmission ring, and to provide . . . Edison . . . with a connection to . . . the New England Grid." Three 345 KV lines (see sketch map) connect the Grid with Edison's Medway substation. From there Edison plans to transmit power (230 KV) over the proposed line to Sudbury. From Sudbury, Edison hopes to transmit power (115 KV) to Waltham over a line already constructed (see sketch plan).

justice of this court then entered an order (October 6, 1969) transferring to the county court all the cases mentioned above then pending in the Superior Court. See G. L. c. 211, § 4A, inserted by St. 1962, c. 722, § 2. The parties, acting with great expedition, have submitted a consolidated statement of agreed facts. The cases have been reserved, without decision, for the determination of the full court.

Portions of the right of way between Medway and Sudbury are already used for transmission lines (13.8 KV and 115 KV) supported on wood poles, described by the D.P.U. as "from 65 to 80 feet" in height "depending on the terrain." The contemplated construction, on the other hand (see the *Framingham* case, 355 Mass. 138, 140–141) is to be on "two circuit, wide base, lattice type, steel towers varying in height from 110 to 125 feet, except at certain substations where the towers would be 160 feet in height. The structures would be spaced . . . [about] 1,000 feet apart. Clearance above the ground of the wires suspended from such structures would be not less than twenty-five feet, and over highways not less than twenty-eight feet." The towns greatly fear the line's "deteriorating effect on aesthetic and property values as well as safety considerations."

Edison in 1967 began to build the proposed line in Medway, Holliston, Sherborn, and Natick. These four towns did not appeal from the D.P.U.'s decision which resulted in the *Framingham* case, 355 Mass. 138. By December, 1968, the proposed line had been constructed between the Medway substation and the Natick-Framingham boundary. After the decision in the *Framingham* case, Edison started to build parts of the proposed line in Sudbury. There has been no further construction since the injunction issued by the single justice on August 6, 1969. No wires, forming part of the proposed line, have been installed over or under any public ways (mentioned later in part 3 of this opinion) in Framingham and Wayland as to which Edison has no presently existing rights of record under G. L. c. 166, §§ 21, 22, or 28, or over or under Stock Farm Road in Sudbury (see part 4 of this opinion).

The parties have agreed that there are four principal controversies presented by the present record.[3] These are discussed separately below.

1. On the first controversy, the towns contend that Edison must obtain from the D.P.U. a determination of public convenience and necessity under G. L. c. 164, § 72, as amended (see fn. 4). Edison, however, points out (a) that so much of the proposed route as lies within Sherborn (as was not already controlled by Edison) was acquired by Edison in 1941 under D.P.U. orders of May 13 and July 29, 1941, and (b) that portions of the route in Framingham, Wayland, and Sudbury, not then owned or controlled by Edison, were acquired by eminent domain either in 1953, pursuant to an order of the D.P.U. of November 30, 1951, or in 1955, pursuant to D.P.U. orders of July 28, 1955. See *Cole* v. *Boston Edison Co.* 338 Mass. 661. Edison then argues, in effect, that, because it already controls some easement over all the proposed route (except across certain streets or roads; see parts 3 and 4 of this opinion), there is no occasion for it to obtain from the D.P.U. any determination of public convenience and necessity under c. 164, § 72. In practical effect, Edison contends that § 72 does not require a transmission company to obtain any certificate of public convenience and necessity for construction of any transmission line (or of a line greatly increased in capacity and in size of structure from an existing line) over an easement which the company already controls. Edison (as indicated above) has agreed that, as to "the line from the Medway substation to the Sudbury substation" now proposed, "Edison has never obtained any specific approval of any

---

[3] The consolidated statement of agreed facts says these are: "(1) whether a further determination of public convenience and necessity is required under . . . G. L. c. 164, § 72, as most recently amended, before Edison . . . [may] construct the [proposed] line . . . on an easement or right of way already owned or controlled by it; (2) the applicability . . . of the [Sudbury and Wayland] building codes . . . to the construction of the [proposed] 230 KV line . . . (3) the sufficiency of Edison's rights, if any, under . . . G. L. c. 166, §§ 21, 22, and 28, as most recently amended, to . . . construct the wires . . . across various public ways which lie in the path of its easement . . . and (4) whether . . . Stock Farm Road in . . . Sudbury is a 'public way' within . . . G. L. c. 166, §§ 21, 22, and 28."

part of . . . [the] line by the D.P.U." under § 72, and contends that no such approval is now required.

The first controversy requires reëxamination of G. L. c. 164, § 72 (as amended through St. 1965, c. 457), which is set out in the margin.[4] There have been inserted in the text of § 72 in brackets various capital letters for the purpose of convenient reference [5] to the portions of the section immediately following these letters, respectively.

---

[4] Section 72, as amended, reads: "[A] An electric company may petition the department for authority to construct and use or to continue to use as constructed or with altered construction a line for the transmission of electricity for distribution in some definite area or for supplying electricity to itself or to another electric company or to a municipal lighting plant . . . and shall represent that such line will or does serve the public convenience and is consistent with the public interest. [A-1] The company shall forward at the time of filing such petition a copy thereof to each city and town within such area. [See fn. 5, *infra*.] The company shall file with such petition a general description of such . . . line and a map . . . showing the towns through which the line will . . . pass and its general location. The company shall also furnish an estimate showing . . . the cost of the line and such additional . . . information as the department requires. The department, after notice and a public hearing in one or more of the towns affected, may determine that said line is necessary for the purpose alleged, and will serve the public convenience and is consistent with the public interest. [B] If the company [C] shall file with the department a map . . . . showing [D] the towns through which . . . [the line] will . . . pass, the public ways, railroads . . . [and] navigable streams . . . in the town[s] . . . which it will cross, and the extent to which it will be located upon private land or upon, under or along public ways and places, the department, after . . . notice . . . shall give a public hearing . . . in one or more of the towns through which the line . . . is intended to pass and may by order authorize the company to take by eminent domain under . . . [c. 79] . . . such rights of way or widenings thereof, or other easements therein necessary for the construction and use . . . of such line along the route prescribed in the order of the department. The department shall transmit a certified copy of its order to the company and the clerk of each such town. The company may at any time before such hearing change or modify the whole or a part of the route of said line . . . . [E] If the department dismisses the petition at any stage in said proceedings, no further action shall be taken thereon, but the company may file a new petition after the expiration of a year from such dismissal. [F] When a taking under this section is effected, the company may forthwith, except as hereinafter provided, proceed to erect, maintain and operate thereon said line. . . . [G] No lands or rights of way or other easements therein shall be taken by eminent domain under . . . this section in any public way, public place, park or reservation . . . and [H] no electricity shall be transmitted over any land, right of way or other easement taken by eminent domain . . . until the electric company shall have acquired from the . . . selectmen . . . all necessary rights in the public ways or public places in the town or towns, or in any park or reservation, through which the line will or does pass."

[5] To avoid possible confusion, the bracketed letters have not been changed from those used in 1962 in reproducing § 72 in the first *Sudbury* case, 343 Mass. 428, 430, fn. 2, except that immediately following the new bracketed [A-1] is a sentence later inserted by St. 1965, c. 457.

The earliest predecessor of § 72 is found in St. 1914, c. 742, § 128. The section, revised in various respects thereafter, was initially considered in detail by this court in the first *Sudbury* case, 343 Mass. 428. There we had to decide whether an appeal under G. L. c. 25, § 5 (as amended through St. 1956, c. 190), by the town of Sudbury from D.P.U. action under the first sentence of § 72 was "from the final decision of the [d]epartment." There was thus occasion to ascertain what the Legislature had contemplated as the D.P.U.'s procedure under the "not wholly clear" language (343 Mass. 428, 431) of § 72. We interpreted the section as follows: "(1) Initially, a company wishing to build a transmission line must file with the department a petition (see point [A]) for 'authority to construct and use . . . a [transmission] line.' The appropriate departmental action upon such a petition, if . . . approved . . . is a determination that . . . [the] line is necessary . . . will serve the public convenience and is consistent with the public interest. (2) If the company cannot acquire the necessary right of way by negotiation, the company (see portion of § 72 between points [B] and [E]) may file detailed plans with the department, which then . . . may 'by order authorize the company to take' by eminent domain . . . the necessary . . . rights of way over privately owned land. The company may file a separate petition for this authority to take land by eminent domain. If there is no occasion for an eminent domain taking (as, for example, because all necessary land can be acquired by negotiation), then the company need file no such second petition. After such an order for an eminent domain taking (see point [F]), or without such an order if no eminent domain taking is necessary, the company 'may forthwith, except as hereinafter provided, proceed to erect, maintain and operate . . . [the] line.'" [6] The interpretation of § 72 in the first *Sud-*

---

[6] Discussion of further portions of § 72 in the first *Sudbury* case need not be quoted at length. We pointed out (343 Mass. 428, 433) that no "construction across public ways can be undertaken, until such permission is given by the appropriate local authorities. See G. L. c. 166, § 21 (as amended through St. 1951, c. 476, § 1); § 22 (as amended through St. 1948, c. 550,

*bury* case was quoted with approval in the second *Sudbury* case, 351 Mass. 214, 217. See *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 144–446.

In the first *Sudbury* case, 343 Mass. 428, Edison planned to apply later for the power to take easements by eminent domain. Such an application was in fact made in the second *Sudbury* case, 351 Mass. 214, 215–216. Each of these two cases, therefore, involved either later or immediate eminent domain proceedings. Nevertheless, the language of the first *Sudbury* case, already quoted (see fn. 6 and related text of this opinion) did not limit the first sentence of § 72 to cases involving some eminent domain action.

In the *Framingham* case, 355 Mass. 138, 141–143, Edison contended that § 72 had no application whatever unless a transmission company must have resort to eminent domain proceedings. This issue we then declined to consider for reasons there stated. We held merely that "a proceeding under c. 40A, § 10" (for exemption of the line from local zoning by-laws) "may go forward independently of a proceeding under § 72." In the present case, we must deal with Edison's contention that the first two *Sudbury* cases resulted in an unduly broad application of § 72. See 9 Ann. Surv. Mass. Law, § 15.2.

Edison refers to the long, ambiguous legislative history of § 72, argued and considered in the first *Sudbury* case, 343 Mass. 428, 431. Edison's position, in summary, is that St. 1914, c. 742, § 128, was necessary (see *Comiskey* v. *Lynn*, 226 Mass. 210, 213–214) to permit any eminent domain takings for transmission lines, and that to provide for

---

§ 36); and § 25 (as amended through St. 1951, c. 476, § 2). If such permission is not granted, Edison may then have resort to appropriate proceedings under G. L. c. 166, § 28 (as amended through St. 1961, c. 466)." We also said, "In considering (a) whether a transmission line *shall be authorized at all,* upon an initial petition under § 72; (b) whether eminent domain takings, if necessary, will be authorized by order; or (c) whether to exercise its authority, under G. L. c. 166, § 28, as amended, to overrule local refusals to grant locations across public ways, the department is in each instance exercising a separate function as to which, in the light of the competent evidence before it, it must make a determination. . . . [E]ach stage . . . is a separate proceeding" in which "all relevant questions of the public convenience and necessity must be considered" (emphasis supplied).

such takings (under the supervision of a public predecessor of the D.P.U.) was the sole objective of the 1914 enactment which came as a part of a comprehensive consolidation of statutes relating to the distribution of gas and electricity.[7]

Section 128 of the 1914 act appeared under a heading "Taking land for Transmission Lines." Its text, however, was more broadly expressed. The first, second, and third sentences were phrased in terms closely similar to the first, third, and fourth sentences of § 72 (see fn. 4, at point [A]). The balance of the first paragraph of § 128, however, varied from § 72. It provided that "if it appears [to the D.P.U.'s predecessor board] that the petitioner has rights in the public ways or lanes of such . . . town, or over private lands . . . for not less than three fourths of the length of its . . . line in . . . [that] town, and if in the [board's] opinion . . . said line is necessary . . . and will serve the public convenience and is consistent with the public interest, the board may by order authorize the company to construct or to continue to use such line." The second paragraph, without provision for further hearing, authorized the company after such an order to make eminent domain takings upon terms which need not be stated. The requirement that a specific portion of the right of way be acquired in advance of any determination of public convenience and necessity somewhat points to that determination as being preliminary and related to the permission to use eminent domain later granted by the section. This indication may have been modified, however, by St. 1917, c. 141 (entitled "An Act Relative to the Construction of Lines for the Transmission of Electricity"). Section 128 was amended to provide for at least a two stage proceeding

---

[7] The 1914 act was preceded by various attempts to obtain legislation. See Res. 1910, c. 55 (which called upon the D.P.U.'s predecessor "to investigate the circumstances affecting the transmission of electricity" and to examine the laws relating to the location of transmission lines and the authority of local and certain State officials with respect thereto); 1911 House Doc. No. 1185, pp. 18–22; Res. 1912, c. 51 (calling upon the D.P.U.'s predecessor to make the investigation which resulted in the 1914 consolidation); 1913 Pub. Doc. No. 35, pp. 14, 376a; 1913 House Bill No. 1925, pp. 15–16; 1913 Senate Bill No. 581, pp. 42–45; 1914 Senate Bills Nos. 129, 575.

following a recommendation of the D.P.U.'s predecessor board (see 1917 House Doc. No. 139, pp. 2–3)[8] which permitted first a preliminary hearing and order on public convenience and necessity, without any showing of acquisition of any part of the right of way, and later a second hearing and order directed to the exercise of eminent domain upon such a showing upon terms somewhat modified from the 1914 version.

It is possible, as Edison argues, to view the language of both the 1914 and the 1917 act (and of the board's recommendation, fn. 8), as requiring petitions only with respect to situations where eminent domain later was thought likely to be necessary. Doubtless, a principal purpose of including § 128 in the 1914 consolidation was to provide a procedure under which eminent domain takings for transmission lines could be made. The language of § 128, however, may also be given a broader significance, particularly after the 1917 amendment. The early part (and especially the first sentence) of what is now § 72 permits the interpretation that there shall be a determination of public convenience and necessity (for which an electric company is given permission to apply) as a condition precedent to any new or substantially changed transmission line. This de-

---

[8] See Board of Gas and Elec. Light Commrs. 32d Ann. Rep. pp. 2–3, which reads in part: "When the laws relating to the . . . distribution . . . [of] electricity were codified and extended in . . . [St. 1914, c. 742] a new section (128) was introduced, giving a limited power of eminent domain for the construction of [electric transmission] lines . . . . As a condition precedent to the exercise of this power, it had first to appear, after a public hearing, that the company had acquired rights in the public ways or over private lands for more than three-fourths of its length in the . . . town . . . and that the line was necessary and will serve the public convenience and be consistent with the public interest. Experience . . . has developed a serious embarrassment in that a company has no occasion or even right to invoke the Board's authority until it has purchased or optioned not less than three-fourths of the length of the line in each . . . town . . . and is held up by a few landowners with whom it cannot trade at all or upon reasonable terms. At this stage the Board is called upon to pass for the first time upon the questions which are fundamental to a proper exercise of eminent domain. . . . [T]here should, in the Board's opinion, be first a preliminary hearing and decision upon the broad question of the public convenience and necessity to be served by the line. If this is decided affirmatively, and the company is unable subsequently to acquire rights . . . further hearings and decisions in the same way as at present provided may then be had looking directly to the exercise of eminent domain . . . ."

termination would be a natural requirement for the Legislature to impose upon any public utility with respect to proposals to build substantial, potentially dangerous, and costly transmission lines and structures which may be seriously damaging to communities in the Commonwealth through which the lines are to pass.

Our interpretation of the first part of § 72 in the first *Sudbury* case is consistent with that for which the towns contend, although the language of the decision could now be limited to situations requiring eminent domain. Following the 1962 first *Sudbury* case, however, the Legislature (which must be taken to have known of the 1962 decision; see *Doherty* v. *Commissioner of Ins.* 328 Mass. 161, 164), enacted St. 1965, c. 457 (entitled, "An Act Requiring Certain Public Service Corporations which petition the Department of Public Utilities for Transmission Rights in an Area to Forward a Copy of Said Petition to each City and Town in said Area"). This inserted (see fns. 4, 5, *supra*, at point [A-1]) the present second sentence of § 72, without making any clarifying change in the first sentence. Upon this enactment, the Attorney General (in behalf of the D.P.U.), in a helpful brief as amicus curiae, relies in asking us to adhere to our views in the first *Sudbury* case.

The legislative history is not conclusive.[9] Even if what is now § 72 was intended originally only to have the limited effect for which Edison contends, in its present form it is susceptible of the broader interpretation. We recognize that the 1914 act was passed at a time when there was less regulation of public utilities and land use, and prior to any modern zoning regulation. To adopt the limited construction, however, would deny in some instances to the D.P.U. (apart from any other regulatory powers which it may possess; see fn. 10) control over transmission lines, which it must exercise in any event if eminent domain or disregard of local zoning will be necessary, a control which strongly

---

[9] Statutory changes in § 72 between 1917 and our 1962 decision in the first *Sudbury* case do not help materially in interpreting the statute. See 343 Mass. 428, 431, and fn. 3.

tends to ensure protection of the public interest and which is within the statutory language. A majority of this court hold (although Mr. Justice Reardon adheres to the different view on this issue stated by him in the *Framingham* case, 355 Mass. 138, 142) that Edison must obtain D.P.U. approval of the proposed line under the first sentence of § 72.

2. It is far from clear that either the Sudbury building code or the Wayland building code by its own terms has any substantial application to electric transmission lines. We assume, however, without so deciding, that the language of one code or the other does have some relevance to the proposed line. Neither building code has been approved by the D.P.U. under G. L. c. 166, § 27, quoted later. Edison has never applied for any permit under either code.

Building codes are authorized by G. L. c. 143, § 3 (as amended through St. 1968, c. 499, § 1). This statute had its origin in St. 1872, c. 243 (see *Enos* v. *Brockton*, 354 Mass. 278, 280), which was enacted, of course, long prior to the era of modern electric transmission lines. Edison contends not only that c. 143, § 3, was not intended to permit town regulation of transmission lines, but also that Wayland and Sudbury under their town building codes cannot regulate such lines under c. 143, § 3, in the face of the large body of general State regulation of such lines and the companies which maintain them.[10]

No short answer is to be found in G. L. c. 166, § 27. Section 25 (as amended through St. 1951, c. 476, § 2) gives selectmen power to impose reasonable regulations for the

---

[10] See e.g. G. L. c. 164, §§ 71, 72 (see fn. 4, *supra*); and § 76. See also c. 81, § 7D (inserted by St. 1948, c. 449); c. 92, § 13 (as amended through St. 1950, c. 518, § 2), §§ 43–47 (as amended); c. 132, § 34A (as amended through St. 1950, c. 574); c. 132A, § 3 (as amended through St. 1964, c. 365); c. 164, § 73 (as amended by St. 1926, c. 257). Other relevant sections include G. L. c. 85, §§ 8, 9; c. 166, §§ 21, 22, 28, each as amended. Cf. G. L. c. 166, §§ 22A–22N, inserted by St. 1969, c. 884, § 1, from which transmission (as opposed to distribution) lines are excluded. See § 22A (e). See also § 21F, inserted by St. 1969, c. 882. It should be noted that by G. L. c. 164, § 76C, inserted by St. 1969, c. 645, the D.P.U. has recently been given broad power to establish rules and regulations consistent with c. 164. The Attorney General's brief indicates that the D.P.U. has in preparation safety regulations affecting transmission lines. The record reveals no D.P.U. regulations under § 76C, or earlier provisions of law, which affect the present issues.

erection of all lines "for the transmission of electricity" with
an exception not here pertinent. It is expressly directed
that in cities regulations "shall be made by ordinance."
Section 27 provides, "No *ordinance* or *regulation* of a city
or town, or regulation or restriction imposed in a grant of
location, affecting the erection, maintenance or operation of
a line for the transmission of electricity for light, heat or
power extending or intended to extend from some point in
one city or town through or to some point in another city
or town, shall take effect until approved by the depart-
ment of public utilities" (emphasis supplied). Sections 25
and 27 originally appeared in one section as St. 1914, c. 742,
§ 132. The sections, without explanation, were separated
in the 1921 recodification of the General Laws. We think
that the word "ordinance" in the first line of § 27, in the
light of the language of § 25 (originally the first sentence of
the 1914 statute, § 132), can refer only to action by a city
under § 25, that "regulation" in that line refers only to
regulations of selectmen made under § 25, and that the word
"regulation" and the word "ordinance" in § 27 are not
broad enough to include a town building by-law which
must be adopted by the town in meeting and not merely
by the selectmen. The omission in § 27 of any reference to
town action by by-law may have been a legislative inadver-
tence, but we must apply the statute as it reads in the light
of its legislative history.

In various respects (see fn. 10), the general regulation
of transmission lines, on a reasonably comprehensive basis,
has been placed in the D.P.U. (and in particular instances
in other State bodies especially where State property may
be affected). The D.P.U., in granting a certificate of pub-
lic convenience under c. 164, § 72, is to consider all aspects
of the public interest. We made note in the *Hamilton* case,
346 Mass. 130, 145, that among factors to be included were
"the safety of overhead wires." The elements to be con-
sidered, in our opinion, also include other aspects of safety
such as a town in a comprehensive building by-law might
wish to apply to transmission lines. Section 72 permits the

D.P.U. in taking action thereunder to prescribe reasonable conditions for the protection of the public safety. Similar considerations would lead to like conclusions with respect to D.P.U. action under G. L. c. 40A, § 10, and c. 166, § 28, as amended.

General Laws c. 143, § 3, has been broadly construed. Exceptions to § 3 have been interpreted strictly. See *Slack* v. *Inspector of Bldgs. of Wellesley,* 262 Mass. 404, 406–407. See also *M. Spinelli & Sons Co. Inc.* v. *Cambridge,* 306 Mass. 342, 343. Nevertheless, we think that § 3 was not intended to provide authority for local regulation of the construction of transmission lines, control over which has been so largely entrusted to the D.P.U. Cf. however, *Assessors of Holyoke* v. *State Tax Comm.* 355 Mass. 223, 237–242. It is plainly desirable that there be some uniformity in the safety standards applicable to such lines which pass through more than one town or city and are of general regional or Statewide interest. Such uniformity can hardly be achieved if the standards are left solely to local building codes. The nature of the public need thus sheds some light upon the probable legislative intention behind § 3. We conclude, upon the basis of these considerations, that the building by-laws of Sudbury and Wayland can have no application to the proposed line or to its constituent electrical transmission structures (as opposed to buildings of a type usually subject to building codes).

3. The third issue is whether Edison already has sufficient permits and easements to allow it to construct the proposed line across public ways which lie in its route. See G. L. c. 166, §§ 21, 22, and 28. In the *Framingham* case, 355 Mass. 138, 143–144, we said that the decision did "not relieve Edison from . . . procuring such permissions as may be required under G. L. c. 166 before constructing the new line" (citing the *Concord* case, 355 Mass. 79).

Edison states in its brief that it has sought review by the D.P.U. of the Framingham selectmen's denial of Edison's petition to cross Speen Street (point X on attached sketch map) and Cochituate Road (point W on sketch map) at

new points because of a taking by the Massachusetts Turnpike Authority. A petition to cross two new public ways in Wayland (sketch map, points BB and CC) is pending before the Wayland selectmen. It will be observed from the map that various other street or road crossings lie along the proposed route. As to these (except Stock Farm Road in Sudbury) Edison at times between July 14, 1941, and January 6, 1953, obtained various orders for grants of locations. All these appear to be identical in form although issued by the selectmen of six separate towns (Medway, Holliston, Sherborn, Natick, Framingham, and Sudbury). The inference thus is permissible that Edison prepared these forms, the granting portion of each of which is set out in the margin.[11] It is agreed that (a) when the several boards of selectmen had these locations under consideration, "Edison proposed to construct on the easement . . . lines for . . . transmission of electricity at" 13.8 KV on single wooden poles and 115 KV on H-frame wood poles and had not developed any plan for construction on that route of any 230 KV line on steel towers or otherwise, and (b) that no wires in the 230 KV line will have a diameter which exceeds by more than one-half an inch the diameter of the largest wire now used on the route.

There has been some D.P.U. action or discussion concerning grants of locations on the proposed route and later increases in the size of transmission lines. For example, Edison in 1952 obtained (D.P.U. 10047) on D.P.U. review of the Wayland selectmen under G. L. c. 166, § 28, a location across Stonebridge Road (point AA on sketch map).

---

[11] "Whereas . . . Edison . . . has petitioned for permission to erect . . . a line for the transmission of electricity . . . under and across the public . . . ways . . . hereinafter specified, and notice has been given and a hearing held . . . . It is ordered that . . . Edison . . . be . . . granted permission to erect . . . and a location for such a line of twenty-four wires, under and across the following public . . . ways . . . [list]. All of said wires, of which three (3) are to be under and twenty-one (21) are to be above ground, shall be located within a strip 250 feet wide, the side lines of which are shown on a plan made by                              dated             19 on file with said petition. All such wires above ground shall be placed at a height of not less than twenty feet from the ground." Then follow the selectmen's signatures, a selectmen's certificate of notice under G. L. c. 166, § 22, and a certificate of the town clerk.

This was not expressly limited as to size of structures but only as to number of wires. In 1951, in proceedings concerning portions of the present route, the D.P.U. mentioned that it was "important to Edison . . . that its plans . . . be sufficiently elastic to provide for [a] second circuit at some [future] time." [12]

The towns contend that the locations issued from 1941 to 1953 were given in contemplation of the type of transmission lines then proposed and did not provide, by a sort of licensing "blank check," justification for the much larger structures now being built. Edison argues (a) that such indefinitely phrased permits must be taken to contemplate expansion of the type of use immediately under discussion when the permits were issued; and (b) that there is no room for implying any restrictions not expressly imposed by a board of selectmen under c. 166, §§ 21, 22, and 27,[13] or under § 28 by the D.P.U.

---

[12] D.P.U. No. 15192 preceded the *Framingham* case, 355 Mass. 138. At p. 9, of its opinion, the D.P.U. said of the proposed line in Sudbury, "Obviously . . . an additional transmission line with structures about 45 feet higher than those now occupying the right of way does change the character of the right of way. On the other hand, it is quite clear that any effect upon the area coincided with the construction of the original . . . line . . . . There is no additional divisive effect upon the town and any alleged effect upon property values had its greatest impact when the original right of way was obtained and the line constructed. We do not believe that it is unreasonable for a prudent individual to anticipate that once the lines and right of way had been established additional lines could well be constructed in the future."

[13] Chapter 166, § 22 (as amended through St. 1948, c. 550, § 36) provides that, upon petition and after notice and hearing, selectmen "may by order grant . . . a location [under or across a public way] for . . . [a transmission] line, specifying where the poles, piers, or abutments . . . may be placed, and in respect to overhead lines may also specify the kind of poles, piers or abutments which may be used, the number of wires or cables, which may be attached thereto, and the height to which the wires or cables may run." Section 28 (as amended through St. 1961, c. 466, provides that a company "desiring to construct a [transmission] line . . . which will of necessity pass through one or more cities or towns . . . whose petition for the location necessary for such line has been refused, or has not been granted . . . may apply to . . . [the D.P.U.] for such location." After notice and hearing, the D.P.U. is given the following powers: "If it appears . . . that the company has already been granted and has accepted a location for such line in two cities or in two towns, or in a city and town adjoining the city or town because of the refusal or neglect of whose . . . selectmen to grant a location therefor the application is made, or if it appears . . . that the company has already been granted and has accepted locations for such line in a majority of the . . . towns . . . through which such line will pass, and if the department deems the location necessary for public convenience, and in the

Under the somewhat vague language of §§ 21, 22, 27, and 28, we think that the locations therein mentioned are granted in relation to, and refer to substantially the particular type and magnitude of transmission line and of construction discussed when application is made to the selectmen. It cannot be inferred, when selectmen consider and grant a request for a location of a 115 KV line on H-frame wood poles sixty-five feet to eighty feet high, that thereby they are granting a location for the construction at some time in the indefinite future of a 230 KV line on steel towers 110 to 160 feet high. No doubt, a location, not expressed with precision, may be interpreted as permitting reasonable variations from, and replacements of, the particular structures proposed or in contemplation at the time. The proposed changes, however, seem to us to be substantial. Any doubt concerning the locations we resolve in favor of the public and against the grantee and against any implication of relinquishment of public rights. See Rhyne, Municipal Law, 509. The grants of locations, licenses in the public ways, by the selectmen acting as agents of the Commonwealth (see *Carroll* v. *Cambridge Elec. Light Co.* 312 Mass. 89, 93) must be within the authority, reasonably construed, granted by § 22, the enabling statute (see *New England Tel. & Tel. Co.* v. *Brockton,* 332 Mass. 662, 664–665). At least in the absence of a clear indication to the contrary in the order, exercise of that authority should be viewed in relation to the line under discussion when the order was passed. See *Jennison* v. *Walker,* 11 Gray, 423, 426–427. See also *Chandler* v. *Jamaica Pond Aqueduct Corp.* 125 Mass. 544, 550. Cf. *Marsh* v. *Haverhill Aqueduct Co.* 134 Mass. 106, 108 (right to enlarge buried pipe "to any reasonable extent which would not injure the [servient] landowners"); *Naumkeag Steam Cotton Co.* v. *American Glue Co.* 244 Mass. 506, 508–509. Cf. also *Randall* v. *Grant,*

public interest, it may by order grant a location for such line . . . and shall have and exercise relative thereto the same powers and authority conferred by . . . [§ 22] upon the . . . selectmen and in addition to the provisions of law governing such company may impose such other terms, limitations and restrictions as it deems public interest may require."

210 Mass. 302, 304; *Codman* v. *Wills*, 331 Mass. 154, 158; *Deacy* v. *Berberian*, 344 Mass. 321, 327–328. The selectmen have opportunity reasonably to consider, in the light of the substantial changes in the line now proposed, whether using the location for the new line will surcharge the easement and will "incommode" the public use of the ways which Edison proposes to cross. See the *Concord* case, 355 Mass. 79, 87–93. See also *Hewitt* v. *Perry*, 309 Mass. 100, 105; *Jasper* v. *Worcester Spinning & Finishing Co.* 318 Mass. 752, 761–762; Restatement: Property, §§ 471, 482–484, Am. Law of Property, § 8.66; Powell, Real Property, §§ 407, 415. We hold that, for the substantially increased size of line now proposed, Edison must obtain locations under G. L. c. 166, §§ 21, 22, 27, and 28, as amended.

Under § 28 (as amended by St. 1961, c. 466) giving to the D.P.U. power, in specified circumstances, to review the selectmen's actions in refusing a location for a line, the D.P.U.'s jurisdiction to act depends upon whether Edison has received locations in other communities for the proposed transmission line in accordance with the provisions of that section quoted above (fn. 13). Here Edison, for its existing lines, has such locations to cross ways except as to a few ways concerning which special mention already has been made. The question thus arises whether the D.P.U.'s jurisdiction under § 28 depends upon the necessary number of local grants of locations for the new expanded structures as well as for the original line. We think that it does. If this makes construction impracticable in the circumstances, or if local authorities unreasonably put local considerations above regional and Statewide needs for additional electric power, then revision of § 28 or other statutory change must be sought from the Legislature. The present statutes may well be inadequate to deal with the problems arising from the rapid development of transmission lines and from the conflicts between local interests and broader public interests. The Legislature, if it is disposed to do so, may increase the powers given to the D.P.U. by § 28 to revise local action.

4. Stock Farm Road in Sudbury was laid out by the selectmen on February 20, and the town voted to accept it as a town way on March 12, 1958. "There is no evidence of record . . . that the [t]own owned . . . any . . . rights in Stock Farm Road on March 12" or acquired any within thirty days after the end of the 1958 town meeting. The road "has been open for public use and used . . . for over fifty years and has been kept in repair by the town for over twenty-five years."

It does not affirmatively appear whether, in the efforts to lay out Stock Farm Road, there was compliance with the procedural requirements of G. L. c. 82, §§ 21–23. See *Suburban Land Co.* v. *Billerica,* 314 Mass. 184, 191–194. It also does not clearly appear whether it was "necessary to acquire land for" this way under § 24 (as amended through St. 1958, c. 240). Whatever may be the situation of the town in relation to owners of land who may have been damaged by the laying out of the road, or persons injured on the road asserting rights under G. L. c. 84, §§ 15 and 25, as amended, we think that it, within the meaning of G. L. c. 166, §§ 21, 22, 25, and 28, should be treated as a public way on this record.

5. Edison argues that the absence of street crossing permits in Framingham and Wayland does not preclude all further construction in those towns. We agree with the contention that G. L. c. 166, §§ 21 and 22, deal with construction upon, along, under, and across public ways and not with construction elsewhere. The last clause of G. L. c. 164, § 72 (see point H, fn. 4) prohibits merely transmission of electricity over any land, right of way, or other easement taken by eminent domain until rights in town ways are obtained. We hold that this does not prevent continued construction of the proposed line until such rights are granted. The injunction of August 6, 1969, is to be dissolved. Construction may continue if Edison is prepared to take the risks of later disapprovals. See the second *Sudbury* case, 351 Mass. 214, 224.

6. What has been said, we think, sufficiently deals with

the issues presented by the reservation and report. It enables the parties to make appropriate determinations concerning future proceedings affecting the proposed line and the areas in which it will be necessary or desirable to seek legislative clarification or change of pertinent statutes.

7. The case is remanded to the county court for further proceedings consistent with this opinion.

*So ordered.*