CITY OF ROCKY RIVER *v.* THE CLEVELAND ELECTRIC
ILLUMINATING COMPANY.[1]

(No. 902,939—Decided April 4, 1973.)

Common Pleas Court of Cuyahoga County.

*Mr. Frank H. Lord,* law director, *Mr. William H. Wallace, Messrs. Thompson, Hine & Flory* and *Mr. Alan R. Lepene,* for plaintiff.
*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann* and *Mr. Donald H. Hauser,* for defendant.

MARSHALL, J.   This action concerns itself with the threatened construction by the defendant, The Cleveland Electric Illuminating Company ("CEI"), of a high voltage electric power line identified in this case and known as the "Clague-Edgewater line."

The defendant proposes to construct the Clague-Edgewater line along the Norfolk and Western Railroad right-of-way through present and planned residential, recrea-

---

[1]Judgment reversed by Court of Appeals, December 27, 1973.
Appeal dismissed by Supreme Court, April 4, 1974.

18

tional and commercial areas of the plaintiff, city of Rocky River ("City"). The city of Rocky River is a predominantly residential community consisting of approximately four square miles in the northwestern portion of Cuyahoga County, and has approximately 23,000 inhabitants. The western terminus of the proposed high voltage transmission line, if constructed, will be at the intersection of Clague Road and the Norfolk and Western Railroad right-of-way. The eastern terminus will be at the Edgewater substation in the city of Lakewood.

The purpose of the Clague-Edgewater line will be to supply electric power to the proposed Edgewater substation which, in turn, will serve areas located in the eastern portion of Rocky River and the western portion of Lakewood.

The length of the proposed line will be 3.3 miles, 2.3 of which will be in the city of Rocky River, and the remainder in the city of Lakewood. That segment of the Clague-Edgewater line within the boundaries of Rocky River will be carried on approximately 31 metal poles varying in height between 74 and 110 feet and spaced at approximately 350 foot intervals.

On May 22, 1967, the Rocky River City Council enacted Ordinance 46-67 requiring that any electric power line *carrying more than 33,000 volts* be installed underground and that a permit be obtained from council prior to the commencement of any such underground construction. On December 1, 1969, the defendant filed an application with the then city safety service director requesting permission to extend 33KV (*i. e.* 33,000 volt) conductors across eight streets in the city. In reliance upon the representation that the proposed overhead line would not carry electric power in excess of 33,000 volts, and *without action by council*, the safety service director approved defendant's application.

Subsequently, an official of the City discovered that the City had been misled and misinformed; that the actual potential of the Clague-Edgewater line was not 33,000 volts but, in fact, 138,000 volts. The plaintiff further learned it was the intention of the defendant, after initial construction and some time subsequent to 1981, to increase the volt-

age through the line to the 138,000 volt level. This increase would be affected without alteration to the poles and conductors as originally erected and strung.

On June 23, 1971, the City revoked the previously issued street-crossing permit. Nevertheless, CEI ordered its employees to commence construction. This work was immediately halted by Rocky River and an action was filed by the City seeking injunctive relief from the threatened conduct of the defendant. CEI thereupon answered and counterclaimed seeking an injunction to allow it to proceed with construction.

Shortly after the filing of the action, plaintiff enacted two additional ordinances concerning the construction of electric power lines in Rocky River. Ordinance 19-72 requires the underground installation of all electic power lines, carrying more than 250 volts, which are located within a railroad right-of-way or within 100 feet thereof. Ordinance 20-72 requires the underground installation of all proposed electric power lines carrying voltage within a range of 250 to 33,000 volts.

The undisputed evidence established that the Clague-Edgewater line will initially carry, at all times, voltage in excess of 33,000 volts through the City. The initial voltage level will be between 33,000 and 38,000 volts.

The evidence also established that a variety of circumstances could cause one or more of the conductors on the line to fall. In such an event, the conductor would be energized upon contacting a grounded object and would be reenergized twice after contacting and remaining in contact with a grounded object.

The trial of this lawsuit, which was vigorously contested by counsel for both parties, consumed 14 trial days and produced a transcript of over 2,000 pages. Upon careful review of that transcript the court finds that the City was justified in revoking the previously issued street-crossing permit and that the proposed Clague-Edgewater line does not meet the requirements of the Hot Wires Act, all of which will be discussed more fully herein as part of the court's treatment of the relevant legal issues.

## THE REVOCATION OF THE PERMIT

Defendant, CEI, has argued that the City had no authority to revoke the street-crossing permit granted by the former Rocky River safety service director in 1969. CEI's position essentially is grounded upon two arguments—first, that Ordinance 46-67, enacted in 1967, does not apply to the proposed line and second, that having once issued a permit, the City is estopped from revoking it. In light of the evidence introduced at the trial, the court finds neither argument persuasive.

With respect to the applicability of Ordinance 46-67, requiring underground construction of any transmission line carrying *more than* 33 KV, the great weight of the evidence elicited from witnesses for both parties was that the term KV means 1000 volts and that thus the term 33KV means 33,000 volts. The undisputed evidence established that even initially the proposd line would carry voltage at all times in excess of 33,000 volts; the evidence established that the voltage initially would be between 33,000 and 38,000 volts. Given such evidence, the court finds that Ordinance 46-67 requiring underground construction of any electric power line carrying voltage greater than 33,000 volts is applicable to the Clague-Edgewater line.

Turning to the question of estoppel, the court finds that at the time the street-crossing permit was issued in 1969, Rocky River officials were not apprised of two highly significant facts concerning the Clague-Edgewater line. They were not informed that the line, *initially*, would at all times carry in excess of 33,000 volts and up to 38,000 volts through Rocky River. The application for the street-crossing permit affirmatively stated that the conductors would carry 33,000 volts. Indeed, as late as August 1971, CEI officials attended a public hearing in Rocky River for the express purpose of informing the populace as to the operation of the line and never explained that the actual initial voltage carried by these so-called 33KV conductors would exceed 33,000 volts. Moreover, city officials were not informed that the line's potential capacity as built was to be

actually 138,000 volts, and that conversion to this higher voltage would occur in the 1980's. Given the course of subsequent events in this controversy, it is only fair to conclude that knowledge of these facts in 1969 would have resulted in a denial of CEI's request for a street-crossing permit. By the very terms of then existing Ordinance 46-67, the safety service director would have been precluded from alone granting the permit since underground construction was required and a permit for such underground construction could be issued only by council. Furthermore, who is there among us so naive as to believe that any of the elected public officials of Rocky River would have consented to this permit if they knew or had reason to believe that the transmission line poles running through the center of their city in the closest proximity to their children's playground would be as high as 110 feet and would in the future carry 138,000 volts of electricity.

Accordingly, the court finds that the City was not estopped from revoking the erroneously issued street-crossing permit. As stated in 20 Ohio Jurisprudence 2d 552-553, Estoppel and Waiver, Section 70:

"No estoppel arises from words or conduct which are the result of deceit or misrepresentations on the part of the one claiming it. Nor can one assert the doctrine of estoppel by reason of acts or omissions which he has himself induced and solicited, even though he did so without knowledge of the rights of others."

The Law of Equity sustains the action taken by the city of Rocky River in its revocation of the street-crossing permit.

In this connection, the court notes further that prior to the commencement of this action Rocky River officials were informed by CEI representatives that in the event one of the conductors on the proposed line broke, "it would be dead before it hit the ground." The evidence established the contrary; CEI's representation was misleading, to say the least.

*THE SUBSEQUENTLY ENACTED ORDINANCES*

Given the court's ruling on the applicability of Ordi-

nance 46-47, passed more than two years prior to the issuance of the disputed street-crossing permit, there is little need to spend much time discussing Ordinances 19-72 and 20-72, passed shortly after the commencement of the action, but long before the action was tried. The court finds that these ordinances are not invalid on the grounds of being retroactive. The court notes, in passing, that sub-section (A)(3) of the Hot Wires Act (4905.65) expressly permits the enactment of retroactive ordinances, and that the ordinance found by the Supreme Cout to be a valid enactment in *Cleveland Electric Illuminating Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125, was passed by the Painesville City Council subsequent to the filing of the action in that case. CEI was able to escape from the operation of that ordinance because Painesville, in effect, stipulated that the line would comply with the conditions of the Hot Wires Act. 15 Ohio St. 2d, at 131.

The court finds further, based on the evidence introduced at trial, that Ordinances 19-72 and 20-72 are valid and reasonable insofar as they apply to the Clague-Edgewater line because said line unreasonably affects the welfare of the general public in Rocky River. See *State, ex rel. Ohio Hair Products Co.,* v. *Rendigs* (1918), 98 Ohio St. 251; *Kessler* v. *Smith* (Cuy. Cty. 1957), 104 Ohio App. 213.

### THE HOT WIRES ACT

The main thrust of this action involves a piece of legislation which has become known to those versed in the subject as the Hot Wires Act. (R. C. 4905.65.)

The full text of the Act reads as follows:

"(A) As used in this section:

"(1) 'Public utility' means any electric light company, as the same is defined in Sections 4905.02 and 4905.03 of the Revised Code.

"(2) 'Public utility facility' means any electric line having a voltage of twenty-two thousand or more volts used or to be used by an electric light company and supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electrical lines.

"(3) 'Local regulation' means any legislative or administrative action of a political subdivision of this state, or of any agency of a political subdivision of this state, having the effect of restricting or prohibitng the use of an existing public utility facility or facilities or the proposed location, construction, or use of a planned public utilty facility or facilities.

"(B) To the extent permitted by existing law a local regulation may reasonably restrict the construction, location or use of a public utility facility, unless the public utility facility:

"(1) Is necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation; and

"(2) Is to be constructed in accordance with generally accepted safety standards; and

"(3) Does not unreasonably affect the welfare of the general public.

"Nothing in this section prohibits a political subdivision from exercising any power which it may have to require, under reasonable regulations not inconsistent with this section, a permit for any construction or location of a public utility facility proposed by a public utility in such political subdivision."

The Hot Wires Act was passed by the Legislature subsequent to the decision of the Ohio Supreme Court in *State, ex rel. Cleveland Electric Illuminating Co.,* v. *Euclid* (1959), 169 Ohio St. 2d 476, which held that an ordinance requiring underground construction of transmission lines carrying voltage in excess of 33,000 volts was a reasonable exercise of municipal police power.

The Act, in effect, provides that in accordance with the Supreme Court's decision in *Euclid, supra,* municipalities can still reasonably restrict the construction, location or use of high voltage transmission lines unless it can be demonstrated that the line fulfills all of the conditions set forth in Sub-section (B) of the Act, *i. e.*, that it will be an inter-city line; that it will be constructed in accordance

with generally accepted safety standards; and that it will not unreasonably affect the welfare of the public.

CEI has argued that under the Hot Wires Act, Rocky River has the burden of proving that the conditions set forth in the Act will not be met. The court is unable to agree.

The Legislature expressly provided in the Hot Wires Act that municipal ordinances regulating high voltage transmission lines are effective unless the line in question satisfies all of the conditions in the Act. Moreover, it is an established principle that municipal ordinances are presumed to be valid and effective until the contrary is proven. See *Cincinnati Motor Transp. Assn.* v. *Lincoln Hts.* (1971), 25 Ohio St. 2d 203; *Miesz* v. *Mayfield Hts.* (Cuy. Cty. 1952), 92 Ohio App. 471. Accordingly, the court finds, based on its reading of the Act and its review of relevant authority, that CEI had the burden of establishing by a preponderance of the evidence that the proposed Clague-Edgewater line would comply with each of the conditions set forth in Sub-section (B) of the Hot Wires Act so as to be exempt from the operation of Rocky River's ordinances requiring underground construction. The court emphasizes, however, that regardless of which party had the burden of proof, the evidence introduced at trial establishes that the Clague-Edgewater line does not satisfy the conditions of the Hot Wires Act.

Before addressing specifically each of the conditions of the Act, one additional argument advanced by defendant, CEI, should be considered, namely that the decisions of the courts in *Cleveland Electric Illuminating Co.* v. *Painesville, supra* (15 Ohio St. 2d 125); *Walton Hills* v. *Cleveland Electric Illuminating Co.* (1970), Cuyahoga Cty. Common Pleas Court No. 884475, affirmed (1971), Ct. of App. No. 30862; and *Cleveland Electric Illuminating Co.* v. *Macedonia* (1971), Summit Cty. Common Pleas Court No. 288331 affirmed (1972), Ct. of App. No. 6836, lead inevitably to a result favorable to CEI in this action. If the previous cases teach us anything at all, however, it is that a case-by-case analysis is required under the Hot Wires Act. Moreover,

the differences between the present action and those that have preceded it are significant, to say the least. For example, the *Painesville* case involved primarily the constitutionality of the Hot Wires Act; compliance by the utility with the conditions of the Act was, in effect, stipulated by the parties. The *Walton Hills* case likewise involved primarily the constitutionality of the Act. Moreover, the lines considered in that case were to be constructed on existing utility right-of-way adjacent to already standing transmission towers—a fact which was pressed upon the trial court in that case as being a principal reason for permitting construction to proceed. The *Macedonia* case involved essentially aesthetic questions regarding the type of overhead pole to be used; the question of undergrounding the lines for safety reasons was not before the courts in that case.

The court notes also that the present action represents the first case in which underground construction is technologically feasible.

Turning to the facts involved in the present action, the first condition with which CEI must demonstrate compliance is that the proposed line will be an inter-city facility within the meaning of Sub-section (B)(1) of R. C. 4905.65. Of all the issues, presented to the court for its decision, this was the most troubling, for the evidence clearly established that the line initially will serve two communities—Rocky River and Lakewood—and thus under a literal reading of Sub-section (B)(1) the inter-city requirement is met. However, the court's function is to interpret the language of the Act so as to give effect to the legislature's intent. Here, the line is designed to serve two communities both of which have adopted ordinances requiring underground construction.[2] If the line were designed so that it would serve only the residents of Rocky River, there would be no question that under the Hot Wires Act the City would have the right to require underground construction. If the line

---

[2]The applicability of the Lakewood ordinance to the proposed line is being contested in *Cleveland Electric Illuminating Co.* v. *Lakewood*, Cuyahoga Cty. Common Pleas Court No. 902,360 which has been assigned to the writer of this opinion.

were designed to serve only Lakewood's residents, that community could, under the Hot Wires Act, require underground construction. The legal result should not change because the line will serve portions of these two communities. Certainly it was not the Legislature's intention to have massive electric facilities forced upon unwilling communities when such facilities would serve only the communities that were resisting them. The court finds, based upon the greater weight of the evidence and its interpretation of Sub-section (B)(1) of the Hot Wires Act, that the Clague-Edgewater line will not be an inter-city facility within the meaning of the Act.

The second condition of the Hot Wires Act is that the line be constructed in accordance with "generally accepted safety standards." The evidence offered by CEI with respect to satisfying this condition was that the line would comply with Order No. 72 of the Public Utilities Commission of Ohio and Handbook 81 of the National Electrical Safety Code which is incorporated by reference into Order No. 72. The court finds, however, that compliance with Order No. 72 and Handbook 81 does not, in and of itself, satisfy the requirement in the Hot Wires Act of construction in accordance with generally accepted safety standards.

In this regard, the undisputed evidence established that Order No. 72 and Handbook 81 contain only minimum construction guidelines. These minimum guidelines, for the most part, have not been revised for over ten years but are currently undergoing some revision, the result of which cannot now be predicted. Morever, the City introduced the testimony of a registered electrical engineer who testified that Handbook 81 as presently constituted does not meet the requirements of safety in all areas or under all conditions. In light of this evidence the court finds that, by merely showing compliance with Order No. 72 and Handbook 81, CEI has not sustained its burden of demonstrating that the Clague-Edgewater line will be constructed in accordance with "generally accepted safety standards" as required by Sub-section (B)(2) of the Hot Wires Act.

Moreover, the court finds that compliance with the

"generally accepted safety standard" requirement of the Act can be achieved in this case only by underground construction. The uninsulated line in question would be constructed, in part, next to a children's playground and park and through a densely populated residential area. In addition to the hazards presented to the children in the park, the poles would be within 35 feet of the tracks of the Norfolk and Western Railroad and thus subject to the possibility of railroad accidents. The evidence established that if one of the conductors were caused to fall it would be energized upon contacting a grounded object and would be re-energized twice after contact and remaining in contact with a grounded object to the great peril of anyone or thing coming into contact with it. The evidence demonstrated also that the portion of the tracks running through Rocky River has already been the scene of one substantial derailment, a derailment which might have caused the Clague-Edgewater poles to topple if they had been in place at that time. The designer of the line testified that no one within his company had informed him that a serious derailment had occurred along the site chosen for the line but that had he been apprised of this fact he *might* have changed his plans depending upon the circumstances of the accident. In view of this evidence and upon consideration of the entire record, the court feels that underground installation is the only acceptable safety standard for construction of the line in the location chosen by CEI.

The third condition of the Hot Wires Act is that the line will not unreasonably affect the welfare of the general public. The evidence established, however, that the overhead construction of the Clague-Edgewater line would unreasonably affect the welfare of Rocky River's residents within the meaning of the Hot Wires Act in a number of respects. As demonstrated above the line would constitute a serious and unreasonable safety hazard. The line would have an adverse impact upon the economy of the neighborhood in that property values would be depressed. The line would be a factor tending to cause general deterioration throughout the community. The line would also have a

materially adverse effect upon Rock River's plans for future development. In particular, the line would damage the City's plans to maintain the single family character of the existing residential section along the right-of-way and to redevelop the area along the right-of-way east of the present residential area. Moreover, the line would interfere with the City's efforts to maintain an existing park and develop an additional park along the scenic Rocky River. In this regard the court feels that greater attention should be paid both by the courts and the industry to the effect that lines, such as this, have on our environment. As stated in *Boston Edison Co.* v. *Board of Selectmen of Concord* (Sup. Jud. Ct. Mass. 1968), 242 N. E. 2d 868, 876:

"* * * The presence of power lines across a public way can, in our view, disturb natural beauty sufficiently to create real annoyance to the public users of the way, particularly in a day when such beauty seems to be a rapidly diminishing public asset."

In its review of the record and in its determination of whether the proposed Clague-Edgewater line meets the conditions of the Hot Wires Act, the court has carefully considered the increased costs that would be incurred if this line is installed underground. Regardless of who bears such increased costs—and that is a question that is not within the jurisdiction of this Court to decide—the court is of the opinion that the Clague-Edgewater line as proposed by CEI does not meet the conditions of the Hot Wires Act, and thus is subject to the ordinances of Rocky River requiring underground construction. Accordingly, the court holds that plaintiff is entitled to an injunction permanently restraining defendant from constructing the Clague-Edgewater line along the Norfolk and Western Railroad right-of-way above-ground through Rocky River.

This opinion constitutes the court's findings in accordance with Rule 52 of the Civil Rules.

*It is so ordered.*