EASTERN EDISON COMPANY vs. JOHN J. BARRETT.

Bristol.  May 8, 1986. — June 12, 1986.

Present: GRANT, CUTTER, & ARMSTRONG, JJ.

*Public Utilities. Electric Company. Statute*, Construction. *Words*, "Wires," "Conductors," "Negotiated."

It was held that neither G. L. c. 166, § 39, nor anything in the provisions of c. 166, §§ 21A-21G, authorized an electric utility company to impose a charge for the expenses of temporarily removing its wires to facilitate the movement of a house along a public highway, even in a case where the utility company and the owner of the house had signed a written agreement providing that the owner of the house would reimburse the company for its costs, but also providing that any portion of the agreement "adjudicated unenforceable or in violation of public policy . . . shall be considered null and void." [357-360]

CIVIL ACTION commenced in the Superior Court Department on August 15, 1983.

The case was reported by *Chris Byron*, J.

*Victor N. Baltera* (*Robert G. Bleakney, Jr.*, & *David A. Fazzone* with him) for the plaintiff.

*Robert L. Marder* for the defendant.

CUTTER, J. This case is before us on a statement of agreed facts and a report by a Superior Court judge, without decision, see G. L. c. 231, § 111; Mass.R.Civ.P. 64, 365 Mass. 831-832 (1974), of the issue whether the plantiff (Eastern) is entitled to compensation for its costs in making possible the movement of Barrett's house along a highway in Fall River. Eastern is an electric utility (see G. L. c. 164) which provides electric service in the Fall River area. To move Barrett's house required that Eastern "de-energize . . . disconnect, remove[,] and re-place certain of its high voltage lines (440 volts or greater)." Before doing any of this work, Eastern required that Barrett

pay a deposit of $6,000 and execute a written agreement[1] to reimburse Eastern for specific costs.

This action was initiated by Eastern on August 15, 1983, to obtain a declaration (G. L. c. 231A) whether Eastern was entitled to receive from Barrett the expense caused to Eastern with respect to moving Barrett's house. This expense, so Eastern claimed, amounted to $19,388.70 in addition to the $6,000 deposit.[2]

The trial judge recited essentially the facts outlined above. He then stated the question for determination as follows:

> "Is an electric utility entitled to . . . reimbursement for the cost of protecting, de-energizing[,] and temporarily relocating overhead high voltage lines under" G. L. c. 166, §§ 21A, 21B, 21E, and 21F, "to accommodate the moving of a building or is payment precluded by" G. L. c. 166, § 39, and related statutes?

We answer that such an electric utility is not entitled, in the circumstances, to any such reimbursement. Relevant statutory sections are set out in the appendix to this opinion, together with some legislative history. See also for legislative history of relevant statutes, *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 87-91 (1968); *Shrewsbury* v. *Munro*, 2 Mass. App. Ct. 362, 365-368 (1974). See also *Casey* v. *Massachusetts Elec. Co.*, 392 Mass. 876 (1984).

The earliest predecessor of § 39, St. 1869, c. 141, § 1, was first codified in Pub. Sts. c. 109, § 17 (1882). Although the original coverage of the section applied only to telegraph com-

---

[1] The agreement provided (par. 7), "In the event that any part or portion of this [agreement] is adjudicated unenforceable or in violation of public policy, it is agreed that only such part or portion shall be considered null and void, and such adjudication shall not affect the validity of the remaining terms of the [agreement]."

[2] The parties, however, have agreed that (1) if Eastern is entitled to reimbursement from Barrett for its expenses of making the house movement possible, Barrett will pay to Eastern an additional $7,000, without interest, and (2), if Eastern is not entitled to such reimbursement, Eastern will refund to Barrett the $6,000 deposit without interest.

panies, the present successor, G. L. c. 166, § 39 (see Appendix), has a much broader coverage because the methods of transmission of electricity have assumed new forms and have been carried on with increasing voltages by other types of companies. The circumstance that c. 166, § 39, now must be read with § 38 (which in turn refers to § 21) is strong indication that § 39 was intended to apply to all the types of companies and their transmission wires, lines, and conductors mentioned in § 21, and related sections. The term "conductor" as used in c. 166, §§ 21-21G, certainly includes "wires" if, indeed, the terms are not essentially synonymous (see The American Heritage Dictionary, 307, 1385 [2d College ed. 1982]), in their application to the transmission of electricity. See *Casey* v. *Massachusetts Elec. Co.*, 392 Mass. at 880 n.5.[3] See also *Shrewsbury* v. *Munro*, 2 Mass. App. Ct. at 364 & n.2.

No provision of c. 166, §§ 21A-21G, authorizes the imposition of any charge by an electric company for moving its wires (or for "de-energizing" them) to facilitate the moving of a house. We are of opinion that the Legislature intended no grant of authority to a company to impose such a charge, and that the matter was left to be covered by § 39, which does not permit any such charge. See last sentence of § 39, as quoted in the Appendix. The provisions of §§ 21A-21G we regard as essentially safety provisions. This is indicated by all the legislative background mentioned in the Appendix to this opinion.

---

[3] The *Casey* opinion (at 880 n.5) refers to 220 Code Mass. Regs. §§ 125.26 and 125.40(2) (1978). The language of these regulations makes no pertinent differentiation between the terms "wires" and "conductors," although, see, e.g., § 125.25(9) (1978), both terms are sometimes used. High voltage wires or conductors, of course, are inherently and potentially more dangerous to the public than lower voltage lines, and reasonably should be removed or dealt with (to avoid incommoding the public use of highways) only by the transmission company rather than by town officials, who are probably not equipped or in a position to cut (or to deal safely otherwise with) high voltage lines. It thus would be reasonable for the Legislature to require in c. 166, § 21E, inserted by St. 1969, c. 882 (instead of permitting town officials to cut or remove the wires on as little as ten days' notice under § 39), that the work be performed only after "satisfactory arrangements have been negotiated" by the house mover's contractor with the operator of the high voltage line for a time and in circumstances mutually convenient.

Eastern Edison Co. *v.* Barrett.

We perceive nothing in the *Casey* case, 392 Mass. at 876, to require a different result. That case decides only that § 39 does not require the company (whose *wires* must be removed without charge to the house mover) to pay the cost of removing any *poles*. There is no showing on the present record of any necessity for the removal of any poles or other supports for Eastern's high voltage lines. Poles outside the traveled part of the highway usually do not "incommode the public use of public ways" (see c. 166, § 21, as appearing in St. 1951, c. 476, § 1), and the *Casey* case rests upon a strict application of the language of § 39. High voltage wires (as distinguished from poles or other supports) across or close to a highway, however, may seriously obstruct and endanger the public use of the highway for moving large objects.

We hold that the word "negotiated" in § 21E (see note 3, *supra*, and the appendix) contains no suggestion that the section was designed to afford the operating electric company a chance by negotiations to impose a charge for making it safe to move a house along the highway. As already stated, the section was a part of statutory changes intended only as safety regulations. We think also that par. 7 of the agreement (see note 1, *supra*) adequately protects Barrett from the imposition of any charge by Eastern (by reason of the agreement) for its costs in making it safe to move his house. Such a charge would be against the public policy disclosed by § 39.

As is apparent from the foregoing discussion the reported question is answered that an electric utility is not entitled to reimbursement in the circumstances appearing in this record. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

*CERTAIN RELEVANT SECTIONS OF G. L. c. 166*

*Section 39* reads:

"Whenever, in order to move a building . . . a person desires that the wires of *any such company* be cut, disconnected or removed, the company shall forthwith cut, disconnect or remove the same, if the person desiring this to be done has first left a written statement, signed by himself, of the time when, and the place, described by reference to the crossings of streets or highways, where he wishes to remove said wires, at the office of the company in the city . . . where such place is situated, seven days before the time so stated, or, if there is no such office, if he has deposited such statement in the post office, postage prepaid, and directed to the company at its office nearest to said place, ten days before the time mentioned in said statement. If the company neglects or refuses to cut, disconnect or remove wires, as hereinbefore provided, the inspector of wires . . . may cause the same to be cut, disconnected or removed, and the city . . . may recover of the company in contract the expense of so doing." (Emphasis supplied.)

This section was most recently amended by St. 1958, c. 130. The emphasized words "any such company" in § 39 apply to the companies mentioned in § 38, which mentions street railway companies and electric railroad companies, and "any company, owner, or association described in" § 21.

*Section 21*, as appearing in St. 1951, c. 476, § 1, provides in part:

"A company incorporated for the transmission of intelligence by electricity or by telephone, whether by electricity or otherwise, . . . or for the transmission of electricity for lighting, heating or power, or for the construction and operation of a street railway or an electric railroad, may, under this chapter, construct lines for such transmission upon, along, under and across the public ways . . . by the erection or construction of the poles, piers, abutments, conduits and other fixtures, . . . which may be necessary to sustain or protect the wires of its lines; but such company *shall not incommode the public use of public ways* . . ." (emphasis supplied).

The following provisions were inserted by St. 1969, c. 882, entitled "An Act prescribing precautions to be taken in the proximity of overhead high voltage lines *for the prevention of accidents*" (emphasis supplied).

*Section 21B* reads in part:

"The . . . moving of any house or other building, or any part thereof, under, over, by or near overhead high voltage lines, shall be prohibited, if at any time during such operation or other manipulation it is intended or necessary to bring such . . . buildings or any part thereof within six feet of such overhead high voltage lines, except where such high voltage lines have been effectively guarded against danger from accidental contact, by either:

(1) The erection of mechanical barriers to prevent physical contact with high voltage conductors; or

(2) De-energizing the high voltage conductors and grounding where necessary. Only in the case of either of such exceptions may the six foot clearance required be reduced. The required six foot clearance shall not be provided by movement of the conductors through strains impressed by attachments or otherwise upon the structures supporting the overhead high voltage lines. . . .

If neither (1) or (2) are practicable in the opinion of the utility company or other owner or [operator] of such overhead lines, and it is necessary to temporarily relocate the high voltage conductors, *mutually agreeable arrangements* shall be made with the owner or operator of such lines for their temporary relocation. . . .

. . . .

(4) All mechanical barriers and all insulated protective devices referred to herein shall be of such character and construction as are suited to work operations, and adequate for the electrical conditions to be encountered." (Emphasis supplied.)

*Sections 21C and 21D* deal with warning signs.
*Section 21E reads*:

"Before any operations are to be performed within six feet of any overhead high voltage lines, the person or persons responsible for the work to be done shall promptly notify the utility or other company owning or operating the overhead high voltage lines.

The work shall be performed *only after satisfactory arrangements have been negotiated* between the owner or operator of the lines and the contractor" (emphasis supplied).

*Section 21F* affords an exemption not applicable in the present case and then provides in part:

"As used in sections twenty-one A to twenty-one F, inclusive, the words 'high voltage' shall mean a voltage in excess of four hundred and forty volts, measured between conductors, or measured between the conductor and the ground; the words 'mechanical barrier' shall

mean, temporary devices for separating and preventing contact be-
tween material or equipment and overhead electrical conductors, such
as:—
  (a) Series of poles or the equivalent;
  (b) Nonconductive enclosures around conductors.

'De-energizing' shall mean removing the voltage from electrical con-
ductors.
'Temporary relocation' shall mean:—
  (a) Removing electrical conductors from poles;
  (b) Elevating electrical conductors from poles;
  (c) Rerouting electrical conductors."

[The balance of § 21F deals with definitions not directly relevant in the
present case.]

One bill which was the basis of §§ 21A to 21G when those sections were
inserted by St. 1969, c. 882, was 1969 House Doc. No. 3963, which stated
the purpose of the legislation as follows:

"This act provides for the minimum precautions to be taken during
any excavation, demolition, transportation of equipment, construc-
tion, repair or operation in the proximity of overhead high voltage
lines. The purpose of this act is to provide for the protection of
persons engaged in work of any nature in the vicinity of overhead
high voltage lines, and to define the conditions under which work
may be carried on safely, and the procedures and means by which
these conditions may be created."

Although this provision was not included in c. 882, as finally enacted, it
is relevant legislative history which strongly indicated that §§ 21A-21G
were intended as safety legislation.